J-A06024-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| OWEN ROGAL | |
| Appellant | No. 5 EDA 2014 |

Appeal from the Judgment of Sentence November 18, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002115-2012

BEFORE:  PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED JUNE 02, 2015**

Dr. Owen Rogal appeals the judgment of sentence entered November 18, 2013, in the Philadelphia County Court of Common Pleas.  The trial court sentenced Rogal to a term of one to seven years' imprisonment after a jury found him guilty of 31 charges, including corrupt organizations, conspiracy, theft by deception, attempted theft by deception, and insurance fraud.[1]  The jury determined Rogal and his daughter, co-defendant Kim Rogal, intentionally and systematically used an improper billing code to collect higher payments from insurance companies for procedures performed in their pain clinic.  On appeal, Rogal contends (1) the evidence was insufficient

_____

[1] 18 Pa.C.S. §§ 911, 903, 3922, 901, and 4117(b), respectively.

to support the verdict; (2) the trial court failed to act as gatekeeper when it permitted the dual testimony of Commonwealth witness, Frank J. Dubeck, Jr., M.D., as both a lay witness and expert witness; and (2) the court erred in failing to determine that Rogal's attorney operated under a conflict of interest. For the reasons below, we affirm.

The facts underlying Rogal's conviction are as follows. Rogal and his daughter, Kim Rogal, owned and operated The Pain Center ("TPC"), a clinic that specialized in performing radiofrequency surgery ("RFS") to relieve pain. Rogal, a dentist by trade, supervised the doctors employed by TPC and interviewed prospective patients, while Kim Rogal was the office manager and ran the billing department.[2] Kim Rogal also developed the computerized billing program TPC used to bill insurance companies for the RFS procedure.

RFS is a simple, "low-risk" procedure, performed in an office suite,[3] that uses "high-intensity heat" to reduce pain. N.T., 4/23/2013, at 20, 89. At TPC, a doctor would apply a local anesthetic to numb the area on the patient, and then insert a needle, guided by a fluoroscope,[4] to administer

_____

[2] Kim Rogal also owned the building out of which TPC operated. N.T., 4/25/2013, at 40.

[3] The RFS performed at TPC did not require either a sterile room or an anesthesiologist. N.T., 4/23/2014, at 22, 111.

[4] A fluoroscope is a two dimensional x-ray machine. *Id.* at 31.

heat to a small area to stop the pain. *See id.* at 31-38. The doctors working at TPC did not receive any specialized training, but rather, simply observed other physicians performing RFS for a few days before attempting the procedure themselves. *Id.* at 15. Dr. John Paul Palmerio, who worked at TPC from November of 2004 until March of 2012, testified the doctors at TPC "worked strictly on bone" to relieve pain in the "cervical spine, thoracic spine, lumbar spine, hips, on a knee, or on a[n] elbow[.]" *Id.* at 23.

Since 1990, TPC has been billing insurance companies for the RFS procedure using standard billing code 61790 ("CPT Code 61790").[5] In layman's terms, CPT Code 61790 refers to "destroying tissue with precise locational control by sticking something through the skin that destroys the nerve of the gasserian ganglion." N.T., 4/22/2013, at 75. The gasserian ganglion, located in the "cranial vault," is "one of the 12 cranial nerves in the brain," and "supplies sensation to the face and taste to the anterior two-thirds of the tongue."[6] *Id.* at 69. The procedure described in CPT Code

_____

[5] The Current Procedural Terminology ("CPT") Manual contains standardized billing codes for all medical procedures, which enables insurance companies to process claims electronically. N.T., 4/22/2013, at 50-51. The CPT manual is created by physicians and updated annually. *Id.* at 52. Dr. Dubeck, an expert in medical billing and coding, testified that insurance companies take the code submitted by the medical professional "at face value" so that most claims are processed by the computer and reimbursements are paid within a few weeks. *Id.* at 59.

[6] Dr. John Lee, an expert in neurosurgery, testified the cranial nerves are "a very intricate anatomy and you spend many years studying this anatomy to operate on it safely." N.T., 4/25/2013, at 14.

61790 is a "very delicate" procedure which is usually performed by a neurosurgeon in an operating room with the assistance of an anesthesiologist. *Id.*, at 70; N.T., 4/25/2013, at 21. It is used as a last resort to treat patients with trigeminal neuralgia, "a debilitating facial pain."[7] N.T., 4/22/2013, at 88. While the procedure described in CPT Code 61790 is similar to the RFS procedure performed at TPC, that is, a doctor sticks a needle through the skin to destroy nerves, the doctors at TPC never performed procedures near the brain.[8]

Nevertheless, TPC always billed its low-risk RFS procedure using CPT Code 61790, which had a reimbursement value of $4,800. N.T., 4/23/2013, at 51, 54-55. Whereas, the typical reimbursement value for the actual procedure performed at TPC was $300 to $400. *Id.* at 109. During the course of the subsequent investigation, the Commonwealth determined that TPC billed 12 insurance companies in excess of $5,000,000.00 under CPT

_____

[7] Dr. Lee explained the pain suffered by patients with trigeminal neuralgia is so severe that "[s]ome people have even termed it the suicide pain" because it almost drives patients to suicide. N.T., 4/25/2013, at 11.

[8] Coding expert, Dr. Dubeck, explained the CPT Code Manual specifically instructs physicians to "accurately identify the service performed" and not to "merely approximate[] the service performed." N.T., 4/22/2013, at 79. The Manual states "[i]f no such specific code exists, then report the service using the appropriate unlisted procedure or service code." *Id.* To that end, Dr. Dubeck testified TPC committed a "direct violation of the coding instructions" when they billed their RFS procedure at CPT Code 61790 simply because their procedure "met four out of five elements of the code[.]" *Id.* at 102.

Code 61790.[9]   N.T., 4/24/2013, at 108.   Furthermore, although the Commonwealth's expert neurosurgeon testified it would be rare for a patient to undergo the procedure at CPT Code 61790 more than once, TPC billed insurance companies for as many as 78 treatments for the same patient. *See* N.T., 4/24/2013, at 116-117; N.T., 4/25/2013, at 31.

Eventually, the insurance companies began flagging claims submitted by TPC.   *See* N.T., 4/22/2014, at 123 (Blue Cross Excellus); N.T. 4/24/2013, at 20 (Horizon Blue Cross Blue Shield of New Jersey); 75 (Aetna).   In 2005, both Horizon and Aetna notified TPC that its use of CPT Code 61790 was improper for the procedure actually performed.   Ann Browne, Senior Investigator for Horizon, testified that after meeting with TPC's attorney, Kevin Rafeal, she obtained 12 peer reviews, per his request, which all confirmed that CPT Code 61790 was not appropriate for the procedure performed at TPC.   N.T., 4/24/2012, at 15.   Although she informed Rafeal of the coding problem in 2006, TPC continued to bill Horizon for CPT Code 61790, using the individual physician's taxpayer ID numbers until June of 2010.   *Id.* at 22.   Similarly, Elizabeth Saragusa, fraud investigator for Aetna, testified that Aetna began flagging TPC claims in 2004.  *Id.* at 75.

_____

[9] The records revealed, however, that the insurance companies paid only $1.8 million in reimbursements for the amount billed.  N.T., 4/24/2013, at 109.

Dr. Stuart Kaufmann began working for TPC in late 2004. About a year later, he was contacted by a Blue Cross representative, who informed him of the billing code discrepancy. N.T., 4/23/2013, at 101. Dr. Kaufmann testified at trial that he was angry because he feared he might lose his medical license. *Id.* at 102. He stated he confronted Rogal who responded as follows:

> He tried to reassure me that he had really good attorneys who said that the procedure [was] billed correctly, and not to worry, and I am making something out of nothing, that insurance companies for years have been trying to take him down. It was just more of a witch hunt is basically what he told me.

*Id.* at 103. Dr. Kaufmann then spoke with TPC's attorney, Kevin Rafeal, regarding his concerns about the legality of the code. After that conversation, Dr. Kaufmann left TPC.

In February of 2005, another TPC physican, Dr. John Paul Palmerio, received a similar letter from Highmark Insurance Company questioning his submission of bills using CPT Code 61790. *Id.* at 52, 57. Dr. Palmerio spoke with Kim Rogal the next day. She told him "not to worry" because "[t]hese people are not allowed to do what they are doing." *Id.* at 60. She also told him she was "turning it over to the lawyers who [would] write [him] a letter regarding this matter." *Id.*

Dr. Dubeck, who was medical liaison to the fraud unit for Blue Cross Excellus, testified that his company was notified by another Blue Cross plan

to take a "closer look" at the TPC bills.[10]  N.T., 4/22/2013, at 67.  His investigation revealed the billing code TPC used was for "brain surgery," but the procedure actually performed "was nowhere near the brain."  *Id.* at 68. Blue Cross Excellus began flagging TPC's claims in September of 2009.  In response to an appeal by TPC, Dr. Dubeck sent Kim Rogal a detailed letter on December 18, 2009, in which he explained the use of CPT Code 61790 for the RFS procedure performed at TPC was incorrect and provided two alternative codes for the procedure performed.  *Id.* at 170-173.  However, despite having advised Kim Rogal "in no uncertain terms … not to bill [Excellus] using the code 61790 ever again[,]" Execellus received at least six subsequent bills from TPC in 2010 with CPT Code 61790.  *Id.* at 174-175.

Additionally, in late 2009, the Philadelphia District Attorney's Office received a referral regarding TPC's fraudulent billing practices from the National Insurance Crime Bureau.  After further investigation, District Attorney Detective Karl Supperer secured a search warrant for TPC, which he executed on November 22, 2010.  A 15-month grand jury investigation followed, after which the Commonwealth charged Rogal and his daughter with multiple crimes, including corrupt organizations, conspiracy and insurance fraud.[11]  On February 16, 2012, the trial court granted the

_____

[10] As noted *supra*, Dr. Dubeck testified as both an expert and lay witness.

[11] Both Rogal and Kim Rogal exercised their 5th Amendment rights, and chose not to testify before the investigating grand jury.  N.T., 12/14/2011, *(Footnote Continued Next Page)*

Commonwealth's motion to bypass a preliminary hearing and proceed to trial.

On May 1, 2013, a jury returned a verdict of guilty on all charges against both Rogal and Kim Rogal. Prior to sentencing, Cheryl J. Sturm, Esq., entered her appearance on behalf of Rogal. On October 22, 2013, counsel filed a motion for extraordinary relief challenging, *inter alia*, the sufficiency of the evidence, several evidentiary rulings and a potential conflict of interest regarding trial counsel's representation. The trial court denied the motion without a hearing on November 5, 2013. On November 18, 2013, the court imposed concurrent sentences of one to seven years' incarceration on each of Rogal's 31 convictions.[12] Rogal filed a timely post sentence motion and a motion for modification of sentence, both of which the trial court denied without a hearing. This timely appeal follows.[13]

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

at 10-11. They were represented by the same attorney during the grand jury proceedings, but retained separate counsel after the charges were filed. **See** N.T., 3/7/2012.

[12] The court sentenced Kim Rogal to concurrent terms of 11½ to 23 months' of house arrest, followed by five years' reporting probation on each of her 31 convictions. N.T., 11/18/ 2013, at 58.

[13] The trial court did not order Rogal to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the court's Rule 1925(a) opinion addressed only Rogal's request for bail pending appeal. Thereafter, the Commonwealth filed an application requesting this Court remand the appeal to allow the trial court to file an opinion addressing the claims raised by Rogal in his appellate brief ("Rogal's Principal Brief"). We granted the Commonwealth's request on May 21, 2014, and directed Rogal to file a Rule 1925(b) statement. Upon remand, Rogal filed a lengthy (20-
*(Footnote Continued Next Page)*

In his first issue on appeal, Rogal challenges the sufficiency of the evidence supporting his convictions of corrupt organizations and conspiracy. With respect to the corrupt organizations charge, Rogal argues that there is no evidence he committed a predicate act of racketeering. Further, with respect to the conspiracy charge, he contends he was found guilty by association. Specifically, Rogal asserts there was no evidence he had a shared criminal intent with his daughter to defraud the insurance companies. Rather, he argues, the evidence demonstrates he had no involvement in the billing process, which was handled exclusively by Kim Rogal, and the jury improperly inferred a conspiracy based solely on their father/daughter relationship. He also maintains the remaining convictions were tarnished by the stigma of the corrupt organizations charge.

Our review of a challenge to the sufficiency of the evidence is well-established.

> We review the evidence in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow the jury to find every element of a crime beyond a reasonable doubt.
>
> > In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every

_(Footnote Continued)_ ───────────

page) concise statement, and the trial court filed an opinion in response. Thereafter, this Court granted Rogal's request to file a Supplemental Opening Brief in response to the court's opinion ("Rogal's Supplemental Brief").

possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Tejada*, 107 A.3d 788, 792-793 (Pa. Super. 2015) (citation omitted).

The crime of corrupt organizations is codified at Section 911 of the Crimes Code, which provides, in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 Pa.C.S. § 911(b)(3). It is also unlawful for a person to conspire to violate subsection (b)(3). *Id.* at § 911(b)(4). Subsection (h) defines "enterprise" as "any … corporation, association or other legal entity, … engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." *Id.* at § 911(h)(3). Further, the subsection lists numerous crimes that constitute "racketeering activity," including theft and insurance fraud, and defines a "pattern of racketeering activity" as "a course of conduct requiring two or more acts of racketeering activity one of which

- 10 -

occurred after the effective date of this section." *Id.* at §§ 911(h)(1), (h)(4).

With regard to Rogal's conspiracy conviction, we note:

> To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy. The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. The conspiratorial agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

*Commonwealth v. Feliciano*, 67 A.3d 19, 25-26 (Pa. Super. 2013) (citation and internal punctuation omitted), *appeal denied*, 81 A.3d 75 (Pa. 2013).

Here, the trial court concluded there was sufficient evidence to support Rogal's convictions beyond a reasonable doubt. First, the court detailed the evidence demonstrating "a patent dissimilarity" between the "simple, low risk, pain relief procedure" performed at TPC, and the "brain surgery" billed at CPT Code 61790. Trial Court Opinion, 8/28/2014, at 3-4. The RFS procedure performed at TPC was described as "relatively straightforward and safe." *Id.* at 3. Most of TPC's physicians began performing the procedure after less than a week of observation. *Id.* It required no special training, no anesthesiologist, and no sterile room. *Id.* at 3-4. Conversely, the

- 11 -

procedure billed at CPT Code 61790 was within the brain surgery billing category, and performed "almost exclusively by neurosurgeons." *Id.* at 3. Expert neurosurgeon Dr. Lee testified that the procedure required "extensive training" and required both an attending anesthesiologist and sterile operating room. *Id.* The trial court also noted that the "patent dissimilarity" between the two procedures is even more evident when considering the reimbursement value. *Id.* at 4. CPT Code 61790 had a reimbursement value of approximately $4,800, while the typical reimbursement value for the RFS procedure performed at TPC was approximately $300 to $400. *Id.* at 4-5, *citing* N.T., 4/23/2013, at 51, 54, 109.

Next, the court cited to the evidence which "may have reasonably been interpreted by the jury as suggesting [Rogal's] intimate knowledge of [TPC's] billing practice as well as his control and complicity therein." *Id.* at 4. First, Rogal described himself as "the individual who ran the Pain Center." *Id.*, *citing* N.T., 4/23/2013, at 13. When Dr. Kauffman confronted him in 2005 with the letter he had received from an insurance company questioning the billing code, Rogal "neither expressed confusion nor directed the inquiry to [Kim Rogal]." *Id.* at 4. Rather, the court explained:

> [Rogal] declared that the billing was being handled correctly, further explaining that insurance companies have been on a witch hunt, contesting his billing method for years.

*Id.*, *citing* N.T., 4/23/2013, at 103. Second, the trial court noted that when Dr. Palmerio confronted Kim Rogal with a similar letter, her "response

mirrored that of [Rogal], assuring Dr. Palmerio that his concern was misplaced." *Id.* at 4, *citing* N.T., 4/23/2013, at 50. The court opined:

> Their shared retort when challenged about billing supported a reasonable inference that [Rogal and Kim Rogal] shared the conspiratorial intent to fraudulently bill rather than, as [Rogal] maintains, demonstrating that [Kim Rogal] was acting as a rogue employee.

*Id.* at 4.

Finally, the trial court noted "the expression of uncertainty by [Rogal's] attorney regarding the propriety of [CPT C]ode 61790" who described the billing to Dr. Kauffman as "an ambiguous grey area." *Id.* at 5, *citing* N.T., 4/23/2013, at 115. The court opined the jury may have interpreted Rogal's staunch support of the use of CPT Code 61790 in contrast to his attorney's uncertainty "as corroborative of [Rogal's] illicit intent." *Id.* at 5. Based upon the foregoing, the trial court found the evidence was sufficient to support a guilty verdict on the charges of corrupt organizations and conspiracy.

Our review of the record supports the trial court's decision. First, with regard to his corrupt organizations charge, Rogal argues there was no evidence he committed "even one predicate act of racketeering." Rogal's Principal Brief at 12. Rather, he contends, the evidence demonstrated that Kim handled all the billing and developed the computerized billing system.

However, the racketeering statute proclaims it unlawful to participate "directly **or indirectly**" in a pattern of racketeering activity. 18 Pa.C.S. § 911(b)(3) (emphasis supplied). Here, the Commonwealth presented

- 13 -

evidence that indirectly linked Rogal to the racketeering activity. For example, Rogal characterized himself as "the gentleman who ran The Pain Center." N.T., 4/23/2013, at 13. Moreover, based on his response to Dr. Kauffman's concern regarding the billing, the jury could infer that Rogal was clearly aware of the billing issue, and, in particular, the insurance companies' objections. *See id.* at 103. It strains credulity to believe that Rogal, who was clearly the "doctor" in charge of the practice and director of the clinic, did not, at the very least, acquiesce to the improper billing practices when TPC continued to bill insurance companies at a reimbursement rate ten times the value of the procedure even after being explicitly instructed to stop doing so by the insurance companies. Furthermore, Rogal's attempt to hide behind the advice of his attorney is similarly unavailing when two doctors in his practice both testified that a reimbursement value of $4,800 for the procedure they were performing was outrageous. *See id.* at 73, 109-110. Indeed, Rogal's practice was receiving reimbursements ten times their value and billing for multiple procedures on a single patient when the Commonwealth's expert neurosurgeon testified he would rarely perform the procedure at CPT Code 61790 even twice. Accordingly, we find the Commonwealth presented sufficient evidence for the jury to conclude that Rogal **conspired** with Kim to seek reimbursements for the RFS procedure at a much higher value than the procedure warranted, and therefore, either directly or indirectly, participated in a pattern of racketeering activities.

With respect to his conspiracy conviction, Rogal contends the evidence established "nothing more than guilt by association." Rogal's Principal Brief at 16. Specifically, he argues the jury inferred his guilt based solely on his father/daughter relationship with Kim, when "[t]he established facts indicate that [Kim] acted alone when she took it upon herself to submit bills using CPT Code 61790, and took it upon herself to defend the use of Code 61790." *Id.* at 21.

Again, we agree with the trial court that "the jury was presented with evidence beyond merely the familial relationship to infer a conspiratorial agreement." Trial Court Opinion, 8/28/2014, at 5. Rogal was the person who "ran" TPC. N.T., 4/23/2013, at 13. Although Kim handled the billing procedures, she was not a doctor. Therefore, it was reasonable for the jury to infer that Rogal was consulted regarding any medical questions about the billing. Moreover, Rogal was clearly aware of the insurance company disputes, in which he defended the billing practice when confronted by Dr. Kauffman – characterizing the dispute as an insurance company "witch hunt"[14] - and continued to approve billing under CPT Code 61790 after being instructed by the insurance companies to stop doing so.[15] Accordingly, we find Rogal is entitled to no relief on his first issue.

_____

[14] N.T., 4/23/2013, at 103.

[15] As noted *supra*, Rogal's attempt to place the blame on his attorneys is unavailing. He emphasizes the testimony of Drs. Kauffman and Palmerio who
*(Footnote Continued Next Page)*

Next, Rogal contends the trial court "abdicated [its] role as gatekeeper" when it failed to provide the jury with contemporaneous instructions during the dual lay/expert testimony of Commonwealth witness, Dr. Dubeck. Rogal's Principal Brief at 23. Rogal insists that Dr. Dubeck testified only as an employee of Blue Cross Excellus, and not as an expert witness, and the court should have instructed the jury as such. He argues the court's failure to do so "guaranteed confusion on the part of the jury." *Id.* at 24.

Preliminarily, we note that "[a] trial court has broad discretion to determine whether evidence is admissible and a trial court's ruling on an evidentiary issue will be reversed only if the court abused its discretion." *Commonwealth v. Huggins*, 68 A.3d 962, 966, (Pa. Super. 2013) (citation omitted), *appeal denied*, 80 A.3d 775 (Pa. 2013). Furthermore, this Court has held that a witness may testify as both a lay witness and expert witness during trial. As we opined in *Huggins*, *supra*:

*(Footnote Continued)* ────────────

stated that both Rogal and Kim Rogal directed them to TPC's attorney when they inquired about the billing practices. **See** Rogal's Supplemental Brief at 3-4. However, as the trial court noted in its opinion, Dr. Kauffman testified TPC's attorney told him that CPT Code 61790 was "ambiguous" and the proper code was "a grey area." N.T., 4/23/2013, at 115. Furthermore, Dr. Kauffman testified that after this conversation with TPC's attorney, **he left his position** at TPC. **Id.** at 103-104. Subsequently, he opened his own RFS practice, where his typical reimbursement is $300 to $400 per procedure. **Id.** at 109. Therefore, the jury clearly could have determined Rogal's feigned ignorance of the billing dispute was incredible.

[Pa.R.E.] 702 permits an expert to testify to scientific, technical or other specialized knowledge beyond that possessed by a layperson. [Pa.R.E.] 701 permits a layperson to testify in the form of an opinion, however, such testimony must be rationally based on that witness' perceptions. Thus, an expert must have additional specialized knowledge in rendering an opinion; whereas, a lay witness must form an opinion based upon his or her rationally based perceptions. The Rules, however, do not specifically delineate that a witness must be only one or the other. Instead, the witness' association to the evidence controls the scope of admissible evidence that he or she may offer. Furthermore, Pennsylvania Rule of Evidence 704 clearly permits both expert and lay opinion testimony on issues that ultimately must be decided by the trier of fact, in this case, the jury.

*Id.* at 967.

In the present case, contrary to Rogal's assertion, Dr. Dubeck was accepted by the trial court as "an expert on medical billing." N.T., 4/22/2013, at 60. Rogal did not object to Dr. Dubeck's qualifications as an expert witness, and therefore, he has waived any challenge to that ruling on appeal. *See* Pa.R.A.P. 302.

With regard to Dr. Dubeck's dual testimony as both a lay and expert witness, the trial court opined:

Although Dr. Dubeck also offered non-expert testimony in the capacity of an insurance company employee, the court found that his dual testimony was easily distinguishable to the jury. [Rogal] specifically challenges an inquiry regarding a letter written by Dr. Dubeck to Kim Rogal condemning the use of code 61790 as necessitating a contemporaneous instruction. The court found that the question, "did you in no uncertain terms in writing advise Kim Rogal not to bill your health insurance company using the code 61790 ever again?" was not an inquiry implicating technical expertise, but rather straightforward, comprehensible lay testimony. [Rogal] affirmatively endorsed the question as formulated, and did not maintain any objection to it. [N.T., 4/22/2013, at 174].

[Rogal] also challenges as confusing Dr. Dubeck's testimony regarding the appropriateness of code 61790 when only four of the five elements (of the code) are satisfied. *Id.* at 102. In contrast to the above non-expert testimony, this particular inquiry seemed to clearly implicate Dr. Dubeck's expertise. Specifically, his testimony that the Pain Center failed to accurately code the RFS treatment was based upon his citation to the procedure delineated in the coding instructions. Given that Dr. Dubeck's expert assessment of the applicability of code 61790 was clearly articulated, the court did not find that the supplemental lay testimony elicited at trial presented an appreciable risk of jury confusion. Furthermore, the jury was instructed on the proper assessment of expert testimony as well as the evaluation of non-expert testimony. N.T. 5/1/2013 at 72-74, 102-103.

Trial Court Opinion, 8/28/2014, at 6. We find the opinion of the trial court appropriately addresses the claim of Rogal on appeal. Accordingly, Rogal's second claim is meritless.[16]

In his last issue, Rogal argues he was denied due process of law because his attorney operated under a conflict of interest. Specifically, he contends that he and Kim were represented by attorneys who practiced in

_____

[16] Rogal also argues that Dr. Dubeck's testimony "is not reasonable or rational" because he "has a bad habit of using the pronoun 'they' without an antecedent noun." Rogal's Principal Brief, at 24-25. However, Rogal does not cite to any examples of this testimony in the trial transcript, and, significantly, does not state that he objected to this testimony at trial. Therefore, this claim is waived. *See Commonwealth v. Thoeun Tha*, 64 A.3d 704, 713 (Pa. Super. 2013) ("We have long held that [f]ailure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal.") (citation omitted); *Commonwealth v. Harris*, 979 A.2d 387, 393 (Pa. Super. 2009) ("When an allegation is unsupported [by] any citation to the record, such that this Court is prevented from assessing this issue and determining whether error exists, the allegation is waived for purposes of appeal.").

the same law firm, and, although he waived the conflict of interest during the grand jury proceedings, his waiver did not extend to their joint jury trial. Further, Rogal argues that if his attorney had been conflict-free, the attorney "would have made an argument distancing [Rogal] from Kim Rogal." Rogal's Principal Brief at 34. Essentially, he claims his defense should have been to blame Kim for the fraudulent billing practices.

When considering whether an attorney operated under a conflict of interest, we must bear in mind the following:

> [R]epresentation of co-defendants by different attorneys of the same law firm constitutes dual or joint representation. ***Commonwealth v. Albertson****,* 269 Pa.Super. 505, 410 A.2d 815 (1979). … However, dual representation is insufficient to support a finding of conflict of interest, and is not a *per se* violation of constitutional guarantees of effective assistance of counsel. ***See Glasser v. United States****,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). To make the dual representation rise to a true conflict, appellant need not show that actual harm resulted, but must at least show the possibility of harm. ***Commonwealth v. Westbrook****,* [400 A.2d 160 (1979)]. The law applicable to dual representation cases was delineated in ***Commonwealth v. Breake****r,* 456 Pa. 341, 344–45, 318 A.2d 354, 356 (1974):
>
> > "Our dual representation cases make several principles clear. First, '[i]f, in the representation of more than one defendant, a conflict of interest arises, the mere existence of such conflict vitiates the proceedings, even though no *actual* harm results. The potentiality that such harm *may* result, furnishes the appropriate criterion.' ***Commonwealth ex rel. Whitling v. Russell****,* 406 Pa. 45, 48, 176 A.2d 641, 643 (1962). Second, a defendant must demonstrate that a conflict of interest actually existed at trial, because 'dual representation alone does *not* amount to a conflict of interest.' ***Commonwealth v. Wilson****,* 429 Pa. 458, 463, 240 A.2d 498, 501 (1968); ***Commonwealth ex rel. Corbin v. Myers****,* 419 Pa. 139, 213 A.2d 356

- 19 -

(1965), *cert. denied*, 386 U.S. 1013, 87 S.Ct. 1361, 18 L.Ed.2d 445 (1967). Third, '[t]o make the dual representation rise to a true conflict, appellant need not show that actual harm resulted, ... but he must at least show the possibility of harm ....' **Commonwealth v. Wilson, supra** [429 Pa.] at 463, 240 A.2d at 501. Fourth, appellant will satisfy the requirement of demonstrating possible harm, if he can show, inter alia, 'that he had a defense inconsistent with that advanced by the other client, or that counsel neglected his case in order to give the other client a more spirited defense.' **Id. Accord**, **Commonwealth v. Cox**, 441 Pa. 64, 69, 270 A.2d 207, 209 (1970) (plurality opinion)."

**Commonwealth v. Evans**, 451 A.2d 1373, 1374-1375 (Pa. Super. 1982).

Our review of the record, however, reveals Rogal was not subject to dual representation, and, even if he was, he waived any potential conflict of interest at the March 7, 2012, bypass hearing.

It is undisputed that Rogal and Kim Rogal were both represented by Todd Henry, Esq., during the grand jury proceedings, and they both executed a conflict waiver during those proceedings. After the criminal charges were filed, the Commonwealth petitioned the court for permission to file Bills of Information without a preliminary hearing. Commonwealth's Petition to File Bills of Information Without a Preliminary Hearing, 2/6/2012. A "bypass" hearing[17] was held on February 16, 2012, at which time, the trial court granted the Commonwealth's motion. Neither Rogal nor Kim Rogal

---

[17] A "bypass" hearing is conducted when the Commonwealth seeks to "bypass" the requirement of a preliminary hearing. **See** Rogal's Principal Brief at 3-4.

was present for the hearing, and a new attorney, who practiced in the same office as Mr. Henry, entered his appearance for Kim Rogal.[18]  Accordingly, on March 7, 2012, the court conducted a second bypass hearing, with both defendants present, to address whether their attorneys were operating under a conflict of interest.  *See*  N.T., 3/7/2012, at 2-5.

At the March 7th hearing, an associate of Mr. Henry appeared on behalf of Rogal, and Jeremy Walker, Esq. appeared on behalf of Kim Rogal.  The prosecutor raised a concern regarding a possible conflict of interest because Mr. Walker practices in the same office suite as Mr. Henry, and his full biography is listed on Mr. Henry's web site "as one of Mr. Henry's associates."  *Id.* at 8.  However, Mr. Walker explained that while he serves as general counsel for Mr. Henry's firm on civil cases, he maintains his own firm for his criminal practice:

> Basically, I have my own separate [practice] with regards to criminal law.  I have my own firm, own LLC, own business ID. The only thing I do with Mr. Henry is I'm his general counsel when it comes down to civil cases.  Obviously, this is not a civil case.  So that's the only time we intermingle business is when it comes down to civil cases.  As to criminal, we have two separate practices.

*Id.* at 7.

Accordingly, based upon Mr. Walker's averment that his criminal practice is separate from Mr. Henry's criminal practice, we do not find that

---

[18] Mr. Henry continued to represent Rogal.

Rogal and Kim Rogal were subject to dual representation. Nevertheless, even if the attorneys' association did present a potential conflict in these circumstances, we conclude Rogal and Kim Rogal unequivocally and knowingly waived any conflict of interest.

It is well established that:

An individual may knowingly and intelligently waive a constitutional right. For that individual to be able to make a knowing and intelligent waiver of a constitutional right, he must have been aware of both the nature of the constitutional right and the risk of forfeiting the same. In such a situation the record must clearly demonstrate an intentional relinquishment of a known right or privilege. … Moreover, the Commonwealth merely needs to establish a knowing and intelligent waiver of a constitutional right by a preponderance of the evidence.

*Commonwealth v. Szekeresh*, 515 A.2d 605, 607 (Pa. Super. 1986) (citations omitted), *appeal denied*, 529 A.2d 1080 (Pa. 1987).

In the present case, after Mr. Walker explained that he and Mr. Henry shared office space but maintained separate criminal practices, the trial court conducted the following colloquy:

THE COURT: Okay. And Doctor Rogal, has [the shared offices of Mr. Henry and Mr. Walker] been explained to you?

DOCTOR ROGAL: Yes.

THE COURT: Ms. Rogal, has this been explained to you as well?

MS. ROGAL: Yes.

THE COURT: And you have independently retained, Doctor Rogal, Mr. Henry's office?

DOCTOR ROGAL: Yes.

THE COURT: And, Ms. Rogal, you have independently retained Mr. Walker's office?

MS. ROGAL: Yes.

THE COURT: Okay. And you both understand that they work together but they maintain separate practices?

DOCTOR ROGAL: Yes.

MS. ROGAL: Yes.

THE COURT: Okay. And do you each understand that you may – or actually do have a conflict being defenses regarding the charges which have been brought against you?

DOCTOR ROGAL: Yes.

MS. ROGAL: Would you explain that?

THE COURT: Yes. In other words, there has been charges brought against each of you, and there could potentially be different defenses which may apply to each of your cases.

MS. ROGAL: Thank you. Yes.

THE COURT: Okay. And have you considered that factor in terms of your retaining counsel to represent each of you?

DOCTOR ROGAL: Yes.

MS. ROGAL: Yes.

THE COURT: Okay. And do you each understand what a conflict of interest is?

DOCTOR ROGAL: Yes.

MS. ROGAL: Yes.

THE COURT: Okay. Has anyone forced you in any way into retaining the attorneys that you have retained?

DOCTOR ROGAL: No.

MS. ROGAL: No.

THE COURT: And you've each agreed to this arrangement; is that correct?

DOCTOR ROGAL: Yes.

MS. ROGAL: Yes.

THE COURT: And do you understand that by agreeing presently that you are essentially waiving any future right to raise this issue regarding what may be perceived as a conflict of interest?

DOCTOR ROGAL: Yes.

MS. ROGAL: Yes.

THE COURT: And at this time, do either of you wish to reconsider your choice regarding the selection of counsel?

MS. ROGAL: No.

…

DOCTOR ROGAL: No.

THE COURT: Okay. Do you have any questions of the Court at this time?

DOCTOR ROGAL: No.

MS. ROGAL: No.

…

THE COURT: Okay. Then the Court, having colloquied Doctor Rogal and Ms. Rogal, is satisfied that they've made a knowing, intelligent, and voluntary selection of counsel. Okay.

*Id.* at 8-11.

Accordingly, contrary to Rogal's contention, Rogal and Kim Rogal unequivocally and knowingly waived any potential conflict of interest **after** the criminal charges were held for court. **See** Rogal's Principal Brief at 29. The court did not simply presume their waiver of a dual representation conflict during the grand jury proceedings was sufficient to waive any potential conflict for trial.[19] Therefore, Rogal's final claim fails.

_____

[19] Indeed, the record demonstrates that on December 14, 2011, both Rogal and Kim Rogal knowingly and voluntarily waived their right to have separate
*(Footnote Continued Next Page)*

Because we conclude the three issues raised by Rogal on appeal merit no relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/2/2015

*(Footnote Continued)* ───────────

counsel, and chose to have Mr. Henry represent them both during the grand jury proceedings. **See** N.T., 12/14/2011, at 4-11. Thereafter, they again waived any potential conflict of interest, after the grand jury proceedings were complete and the criminal charges were filed, when Kim Rogal chose to be represented by Mr. Walker who shares an office suite with Mr. Henry. See N.T., 3/7/2012, at 8-11.