J-A27020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JEROME KING | : | |
| | : | |
| Appellant | : | No. 164 EDA 2019 |

Appeal from the Judgment of Sentence Entered November 9, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0009432-2017

BEFORE:   BOWES, J., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY SHOGAN, J.:                 **FILED DECEMBER 16, 2019**

Appellant, Jerome King, appeals from the judgment of sentence following his conviction by a jury of first-degree murder, firearms not to be carried without a license, carrying firearms in Philadelphia, and possession of an instrument of crime ("PIC").[1]  We affirm.

An information was filed on November 7, 2017, and trial occurred November 5–9, 2018.  Following Appellant's convictions of the above crimes, the trial court sentenced Appellant on November 9, 2018, to life in prison for murder and did not impose further penalty on the remaining convictions. Appellant filed a post-sentence motion for a new trial assailing the weight of

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 6106(a)(1), 6108, and 907, respectively.

the evidence on November 13, 2018, which the trial court denied on December 26, 2018. Appellant filed this timely appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

The facts of the crime are as follows. Philadelphia Police Officer Lacarmela Fortune responded to a radio call on June 20, 2017, at 10:36 a.m. that a male had been shot at the intersection of 29th Street and Cecil B. Moore Avenue. N.T., 11/6/18, at 62–63. When Officer Fortune arrived, she found a burgundy car smashed into a black car, which crashed into a grey car. *Id.* at 65–66. An unconscious man, later identified as Marvin Brunson ("Victim"), was slumped over on the front driver's seat of the burgundy car, with his head leaning "almost out the [driver's] window." *Id.* at 67–68. There were no other occupants in the automobile. *Id.* at 65, 68. Victim had blood on his chest, and he still had his foot on the gas with the vehicle "revving." *Id.* at 68. A second police car "pulled up right away," and Officer Fortune testified, "[W]e opened the door. We got the male out of the vehicle and put him into the other unit's vehicle and they took him to the hospital." *Id.* at 67.

Victim was pronounced dead at 10:49 a.m. at Hahnemann Hospital. N.T., 11/6/18, at 89, 96. Dr. Khalil Wardak, Philadelphia Associate Medical Examiner, testified Victim had a "gunshot wound to the right side of the chest, a gunshot wound to the upper posterior shoulder, back of the shoulder, a gunshot wound to the back of the heart, a gunshot wound to the back of the

forearm, and a gunshot wound to the left forearm." N.T., 11/8/18, at 28. Dr. Wardak determined that the gunshot wound to the chest was fatal. *Id.* at 29.

Philadelphia Police Officer Christopher Reed of the Crime Scene Unit testified that he arrived at the scene at 11:45 a.m. on June 20, 2017. N.T., 11/6/18, at 180. Officer Reed collected six .45 caliber cartridge casings; three casings were on the street, and three were in Victim's vehicle. *Id.* at 186–188, 196. Police Officer John Cannon of the Philadelphia Police Department's Firearms Identification Unit testified that all six casings were fired from the same .45 caliber semiautomatic weapon. N.T., 11/7/18, at 169. Two bullets, also .45 caliber, which were recovered from Victim's body, were each fired from the same weapon, but the firearms expert could not determine whether they were fired from the same firearm as the casings.[2] *Id.* at 173–174, 178. In addition, police utilized trajectory rods to determine the path of the bullets. *Id.* at 189. Police were able to determine that the direction of travel of the bullets was "from the rear of the vehicle on the passenger's side through to the driver's seat." *Id.*

Police interviewed Appellant's former girlfriend, Tyera Chapman, three months after the murder and viewed digital surveillance videos from the area. N.T., 11/6/18, at 148–175; 11/7/18, at 25, 43–45. Philadelphia Detective

---

[2] "The only way we can make an association between" bullets and casings is "if we have [the] firearm." N.T., 11/7/18, at 174. Police did not recover the murder weapon.

Billy Golphin testified that during the interview, Ms. Chapman initially denied knowing anything about the murder but never told police she wanted to leave. N.T., 11/8/18, at 88–89, 97. After thirty or forty minutes, Ms. Chapman gave a videotaped statement. *Id.* at 61–62. Detective Golphin read the memorandum he wrote following his interview of Ms. Chapman:

On 9/14/2017, Tyera Chapman, 27-year-old black female, was brought into the homicide unit—

* * *

. . . after members of the homicide fugitive unit and U.S. Marshals conducted a search of her residence and attempted to apprehend homicide fugitive [Appellant]. Chapman was placed in Interview Room B and Detective Tolliver and Golphin spoke with her in reference to [Appellant]. Chapman admitted that she and [Appellant] were in a romantic relationship and that she was aware that [Appellant] was on the run from the police.

Chapman was asked if [Appellant] told her what he was on the run from. She stated he told her that he left the store at 28th and Cecil B. Moore Avenue and someone . . . wearing the same clothing he was wearing killed somebody at 29th Street. She then stated that [Appellant] told her some girl called this guy and told him the boy's been looking—the boy told him the boy he's been looking for was on the corner, and the guy tied his hoody tight and ran up and shot the guy.

Detective Golphin told Chapman the explanation didn't make sense and that [Appellant] called Chapman shortly before and after the homicide. Chapman stated that she didn't want to be a rat and she wasn't going to sign her name to anything. She said he did it. Chapman stated [Appellant]—

The Court: Wait. "She then said."

[Detective Golphin]: He did it. Chapman stated [Appellant] told her someone told him the boy he had a problem with was on the corner. [Appellant] told her he tied his hoody up tight and ran upon him and killed him.

- 4 -

"Detective Golphin and Chapman—asked Chapman if she would consent to be videotaped and she agreed.

N.T., 11/8/18, at 110–111. Ms. Chapman refused to sign the standard document "created after someone is interviewed on video" because "[s]he didn't want to be involved" and "didn't want to be known as a rat." *Id.* at 60–62. The videotaped statement was played for the jury. *Id.* at 65.

Police also examined video surveillance from the crime scene. The trial court summarized the video compilation, which was submitted with the trial court's Pa.R.A.P. 1925(a) opinion and was shown to the jury, as follows:

> The parties stipulated that Detective Thorsten Lucke was an expert in the field of recovery and analysis of digital surveillance video. (November 8, 2018, 24). Detective Lucke testified that he trained at the Federal Bureau of Investigation Forensic Video Image Audio Analysis Unit, in Quantico, VA. He processed more than 1,000 crime scenes recovering surveillance video as well as processing, analyzing these videos for court presentations and news releases. Over the previous six or seven years, he trained federal, state and local agents.

> \* \* \*

> . . . . Surveillance tapes were recovered from three commercial businesses, one apartment building, a police camera, and a public transit bus. (N.T. November 7, 2018, 28).

> \* \* \*

> . . . . Detective Lucke created a "video compilation" from different angles, locations, times and systems. Generally, the scenes are shown in chronological order. (N.T. November 7, 2018, 30).

> \* \* \*

> At 10:20 a.m., the camera at 2800 Cecil B. Moore Avenue shows a black male exit a building and place something in the

garbage. The male is wearing dark jeans gathered at the ankle, a white T-shirt with a colorful logo, a gray hoodie draped over his shoulder, black sneakers with white trim, and a lanyard hanging out of his pocket. (M17-146 Surveillance Video Compilation, 1:30). Multiple cameras capture the male walking north on 28th Street, making a left on Cecil B. Moore Ave, and then a right onto Newkirk Street. (2:50).

At 10:24 a.m., the male can be seen placing an item onto the roof of a parked vehicle on Newkirk Street. (9:05). At 10:26 a.m., the male is seen again on Newkirk Street[] walking back toward Cecil B. Moore Avenue, [and] the male no longer has the gray hoodie draped over his shoulder. (9:37). Cameras pick the male up on Cecil B. Moore Avenue at 10:27 a.m., the lanyard that was previously hanging out of his pocket is now around his neck. (11:14).

From 10:27 until 10:29 a.m., surveillance cameras inside the supermarket located at 1700 North 28th Street (at Cecil B. Moore Avenue) capture the male shopping. (13:13). As part of the compilation, the footage is frozen twice, focused on the male's face, and photographs of [Appellant] were superimposed for comparison purposes. The picture of the male and the picture of [Appellant] both show full beards. (12:22, 13:58).

Also occurring at 10:27 a.m., and recorded on camera, a red vehicle later identified as [Victim's] parks on Cecil B. Moore Avenue—in between Newkirk Street and 29th Street. (15:20). Upon leaving the convenience store, the male walks back toward Newkirk Street.

As the male is walking toward Newkirk Street he walks into the street on Cecil B. Moore Ave, and leans out into traffic as if to get a better view of something up ahead. (17:15). The male continues to stand on the side of the road staring in the direction of [Victim's] vehicle for at least a minute. (18:15). At 10:30 a.m., the male runs up Newkirk Street, towards the vehicle [on which] he had previously placed the gray item. (19:20). At 10:31 a.m., a male wearing dark jeans gathered at the ankle, a white t-shirt with a logo or a lanyard, an un-zipped gray hoodie, and black sneakers with white trim, runs past Steak & All (a restaurant located between Newkirk Street and 29th Street on Cecil B. Moore Avenue[]]. (23:19). A freeze frame of the male running is

compared to two other freeze frames of the male shown earlier in the video. (23:49).

At 10:31:47 a.m., the male wearing the gray hoodie runs up on [Victim's] vehicle. (25:09). It is unclear what the male is doing, but seven seconds later a previously unseen individual begins to run away from [Victim's] vehicle and a car drives off rapidly. (26:17). At 10:32:05 a.m., the male in the gray hoodie walks away from [Victim's] vehicle. (28:02). At 10:32:15 a.m., [Victim's] vehicle drives in front of a SEPTA bus, and crashes into a parked car on 29th Street. (30:10, 30:36).

Trial Court Opinion, 3/19/19, at 7–9.

Based on Ms. Chapman's statements to police and the video surveillance from the crime scene, *inter alia*, police arrested Appellant for Victim's murder on September 14, 2017. While Ms. Chapman testified at trial, and the Commonwealth played the video of the police interview with her, Ms. Chapman did not appear voluntarily, and she denied the veracity of her previous videotaped statement to police. N.T., 11/6/18, at 130, 133–136.

Appellant raises the following issues on appeal:

A. Was the evidence insufficient to sustain the convictions because the Commonwealth failed to prove that Appellant was the person who shot and killed the victim?

B. Did the trial court commit an abuse of discretion by not finding that the verdicts were against the weight of the evidence because the video compilation was not authenticated in accordance with Pa.R.E. 901?

C. Did the trial court commit an abuse of discretion by not finding that the verdicts were against the weight of the evidence because the video of the shooting failed to clearly show that Appellant was the shooter. Tyera Chapman disavowed what was in her stat[e]ment, and in any event, her testimony about what Appellant allegedly related to her was not inculpatory?

- 7 -

Appellant's Brief at 3.

Appellant's first issue assails the sufficiency of the evidence. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Green*, 203 A.3d 250, 253 (Pa. Super. 2019). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." *Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525–526 (Pa. Super. 2016) (quoting *Commonwealth v. Robertson-Dewar*, 829 A.2d 1207, 1211 (Pa. Super. 2003)). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994 (Pa. Super. 2015).

Appellant asserts in conclusory fashion that the evidence presented at trial did not prove that Appellant was the person who shot Victim. Appellant's

Brief at 19–20. Specifically regarding the issue of identity, our Supreme Court

has stated:

> Proof beyond a reasonable doubt of the identity of the accused as the person who committed the crime is essential to a conviction. The evidence of identification, however, needn't be positive and certain in order to convict, although any indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence.

*Commonwealth v. Hickman*, 309 A.2d 564, 566 (Pa. 1973) (internal

citations and quotation marks omitted).

Appellant maintains that the video evidence does not "show the face of

the shooter" nor does it "show [A]ppellant armed with a weapon[,] and police

failed to uncover any ballistic evidence that could be connected to the

shooting." Appellant's Brief at 18–19. Appellant did not raise these particular

objections in his Pa.R.A.P. 1925(b) statement. In that statement, instead,

Appellant stated: "The evidence was insufficient to sustain the convictions

because the Commonwealth failed to prove that Appellant was the person who

shot the victim given that the identification was based solely on the clothes

worn by the shooter and the law is clear that convictions based solely on

clothing cannot stand." Statement of Matters Complained of on Appeal,

2/25/19, at 1. Thus, in his appellate brief, Appellant presents a new theory

with regard to the sufficiency of the evidence of Appellant's identity as the

shooter. *See Commonwealth v. Jones*, 191 A.3d 830, 834–835 (Pa. Super

2018) (finding waiver where defendant challenged identification testimony on

appeal under different theories than those previously addressed to trial court in Pa.R.A.P. 1925(b) statement because trial court did not have opportunity to review those theories).  Indeed, issues not included in a court-ordered Pa.R.A.P. 1925(b) statement are deemed waived on appeal.  Pa.R.A.P. 1925(b)(4)(vii).  We conclude that the sufficiency-of-the-evidence issue as raised in Appellant's appellate brief is waived.

In the alternative, we note that the trial court addressed the sufficiency-of-the-evidence claim, as it was defined in Appellant's Rule 1925(b) statement, as follows:

> The conviction of [Appellant] was not based sole[l]y on his clothing.  He made an admission against interest to Tyera Chapman, his former girlfriend.  [Appellant] told her that he received a telephone call from a female who informed him that the guy he was supposed to be beefing with, was out there.  [Appellant] told Ms. Chapman that he did what he had to do.  He said that he tied the hoodie tight.  He wasn't going to worry about it.  Nobody would care.  In September 2017, [Appellant] stopped by her house, told her that he was wanted by the police and that he would not turn himself in.
>
> Detective Dunlap's cell phone analysis put [Appellant] within a square mile of the scene of the shooting at the time of the shooting.  [Appellant] was associated with premises 1755 North Newkirk Street, which is about two blocks from the scene of the shooting.  [Appellant] spent about 80 percent of his time in that neighborhood.
>
> Detective Lucke's video compilation[] showed a male in the neighborhood at the time of the shooting.  The male wore dark sneakers with white trim, dark jeans, a white T-shirt with a logo on the front.  In different frames the male carried or wore a hoodie, but in other frames the male did not have a hoodie.  Minutes before the shooting, this male was videotaped inside a grocery store. The defense agreed that the male in the supermarket was the [Appellant].  Twice [Appellant's] photograph

- 10 -

was superimposed on the video so that the jury could compare the face of the male with the face of [Appellant]. Both [Appellant] and the male in the video had full beards. The male, with the hoodie tied over his head and part of his face was caught on videotape running away from the scene of the shooting. [Appellant] had told Ms. Chapman that he "tied the hoodie tight and that was it."

Trial Court Opinion, 3/19/19, at 13–14. The jury found that the male in the video was [Appellant], Trial Court Opinion, 3/19/19, at 13–14, and thus, the trial court opined that the verdict was not based solely on the clothing worn by Appellant.

Even if Appellant had properly preserved this alternative basis of his sufficiency claim to the trial court, we would conclude it lacks merit. We remind Appellant that the Commonwealth may sustain its burden by means of wholly circumstantial evidence, **Mucci**, 143 A.3d at 409, and as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. **Rogal**, 120 A.3d 994. This Court has stated:

> [W]e must emphasize that the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. **Commonwealth v. Lehman**, 820 A.2d 766, 772 (Pa.Super.2003). Furthermore, even if the Commonwealth presented only circumstantial evidence and offered no positive identification of the assailant, we may not weigh the evidence and substitute our judgment for the fact-finder as long as the evidence was sufficient to prove Appellant's guilt. **Id.**

**Commonwealth v. Robertson**, 874 A.2d 1200, 1206 (Pa. Super. 2005). Appellant's cell phone records placed him in the area of the shooting at the time of the shooting. Detective James Dunlap, an expert in historical cell-site analysis, in which cellular telephone calls and texts are traced, reviewed

- 11 -

records for a telephone number registered to Appellant and determined that on the date of the murder, between 9:41 a.m. and 10:39 a.m., Appellant's cellular telephone was within the square mile covering the crime scene. During the same time frame, calls made to Appellant's cell phone went unanswered. N.T., 11/7/18, at 200. Ms. Chapman's statements to police, although she attempted to repudiate them, were corroborated by the surveillance video footage.

Viewed through the lens of the proper legal standard regarding the sufficiency of the evidence, we would reject Appellant's claim. Identification evidence "need not be positive and certain to sustain a conviction." **Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa. Super. 2011). Our review of the entire record, with due consideration of all of the circumstantial evidence presented in the light most favorable to the Commonwealth as verdict winner, confirms there was sufficient evidence to establish Appellant's identity and sustain Appellant's convictions.

Appellant also challenges the weight of the evidence. We have held that a motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict." **Commonwealth v. Rayner**, 153 A.3d 1049, 1054 (Pa. Super. 2016) (quoting **Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000)). Our Supreme Court has described the standard applied to a weight-of-the-evidence claim as follows:

The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence." An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

*Commonwealth v. Williams*, 176 A.3d 298, 312 (Pa. Super. 2017) (quoting

*Commonwealth v. Cash*, 137 A.3d 1262, 1270 (Pa. 2016) (internal citations

omitted)). A trial court's determination that a verdict was not against the

interest of justice is "[o]ne of the least assailable reasons" for denying a new

trial. *Colon–Plaza*, 136 A.3d at 529 (quoting *Commonwealth v. Clay*, 64

A.3d 1049, 1055 (Pa. 2013)). A verdict is against the weight of the evidence

where "certain facts are so clearly of greater weight that to ignore them or to

give them equal weight with all the facts is to deny justice." *Commonwealth*

*v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003) (quoting *Widmer*, 744 A.2d

at 751–752). "[W]e do not reach the underlying question of whether the

verdict was, in fact, against the weight of the evidence . . . . Instead, this

Court determines whether the trial court abused its discretion in reaching

whatever decision it made on the motion." *Williams*, 176 A.3d at 312.

Appellant's second issue, assailing the weight of the evidence because

the video evidence was not properly authenticated, is waived. In his post-

sentence motion, Appellant asked the trial court to grant him a new trial based

upon the weight of the evidence. A challenge to the weight of the evidence must first be raised at the trial level "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." **Williams**, 176 A.3d at 312 (citing **Commonwealth v. Akrie**, 159 A.3d 982, 989 (Pa. Super. 2017)). We note that while Appellant challenged the weight of the evidence in his May 9, 2016 post-sentence motion, that motion merely generically states, "The guilty verdicts were contrary to the weight of the evidence and should be reversed in the interest of justice." [Appellant's] Post-Sentence Motion for a New Trial, 11/13/18, at 2. In the Memorandum of Law in support of the post-sentence motion, Appellant asserts only that it was unclear in the video evidence that Appellant was the person therein, there was no eyewitness to the shooting, and no forensic link between Appellant and the crime. Memorandum of Law, 11/13/18, at 10–11. The post-sentence motion assailing the weight of the evidence did not include a challenge to the authentication of the video compilation.

Pa.R.Crim.P. 720 provides that the filing of a post sentence motion is optional. The comment to the rule makes clear that "the failure to brief or argue an issue in the post-sentence motion would not waive that issue on appeal **as long as the issue was properly preserved, in the first instance, before or during trial**." Pa.R.Crim.P. 720 cmt at Optional Post-Sentence Motion (emphasis added). In his brief, Appellant wholly failed to

cite to the record regarding his preservation of the issue at trial. Our independent review of the record reveals that the video compilation was marked for identification and played for the jury at trial without any objection by Appellant. N.T., 11/7/18, at 32. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). We conclude Appellant's claim regarding authentication of the video evidence is waived because Appellant did not challenge it in his Rule 1925(b) statement and did not object to the evidence at trial.

Appellant's final claim that the verdict is against the weight of the evidence "because the video of the shooting failed to clearly show that [A]ppellant was the shooter, Tyera Chapman disavowed what was in her statement, and . . . her testimony about what [A]ppellant allegedly related to her was not inculpatory," Appellant's Brief at 26, parrots the argument in his sufficiency claim and is akin to the weight claim asserted in Appellant's Memorandum of Law in support of his post-sentence motion. The four-paragraph argument in the brief is devoid of any reference to the record. Appellant does not advise what was in Ms. Chapman's statement, where she "disavowed" it, or what Appellant "allegedly related to her." Appellant's Brief at 26–27. Despite these shortcomings, we address the issue in reliance upon the trial court's opinion rejecting this contention, as follows:

> At trial, Tyera Chapman repudiated her prior recorded statement given to Detectives Golphin and Tolliver. She testified that she did not remember anything about the killing, that she previously lied to police, and that she was afraid for herself, her

- 15 -

son and [Appellant]. Her videotaped statement to the Detectives Golphin and Tolliver was properly admitted as substantive evidence.

> Pertinent to our review of this issue, we are mindful that "a prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if it meets additional requirements of reliability." *Commonwealth v. Carmody*, 799 A.2d 143, 148 (Pa. Super. 2002) (citing *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7, 9–10 (1992); Pa.R.E. 803.1).

>> The test is a two-part inquiry: 1) whether the statement is given under reliable circumstances; and 2) whether the declarant is available for cross-examination. With respect to the first prong, that the statement is given under reliable circumstances, our Supreme Court has deemed reliable only certain statements; among them is a statement that is "reduced to a writing and signed and adopted by the witness." *Lively*, 610 A.2d at 10; Pa.R.E. 803.1(1). With respect to the second prong, cross-examination, the inconsistent statement itself must be the subject of the cross-examination in order to satisfy the test.

> *Carmody*, 799 A.2d at 148 (some internal citations and footnote omitted). *See also Lively*, 610 A.2d at 10 (providing prior inconsistent statement is "demonstrably reliable and trustworthy" where statement "had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements").

*Commonwealth v. Enix*, 192 A.3d 78, 81–82 (Pa. Super. 2018).

The jury heard Ms. Chapman's recantation, and viewed the video interview, in which she stated that she had been treated "fine" when she was at the homicide unit and that she had the opportunity to use the bathroom and get water. The jury made a determination as to her credibility and accepted her testimony as

true. The jury determined that what [Appellant] told Ms. Chapman was inculpatory.

> When a trial court evaluates a weight of the evidence claim, the trial court may award relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Clay*, 619 Pa. 423, 64 A.3d 1049, 1054-55 (2013) (citations omitted).

*Commonwealth v. Clemons*, [200 A.3d 441, 463 (Pa. 2019)].

Nothing about this verdict shock's the conscience.

Trial Court Opinion, 3/19/19, at 16–17.

Even if Appellant is correct that Ms. Chapman's prior statement was contradictory, Appellant would not be entitled to a new trial. Questions regarding a witness's prior inconsistent statement are "classic issues of credibility to be decided by the jury." **Commonwealth v. Sanchez**, 36 A.3d 24, 40 (Pa. 2011). The jury concluded that Appellant was the man depicted at the end of the surveillance video compilation. The man in the video was dressed identically to Appellant, both men had the same facial hair, build, and stature, and Ms. Chapman confirmed, like the man in the video, Appellant had reported that he pulled his "hoodie tight." We cannot say that the trial court abused its discretion in ruling that the verdict did not shock the conscience. **Williams**, 176 A.3d at 312.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/16/19</u>