J-S37029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| LARRY CARTER, | |
| Appellant | No. 2588 EDA 2014 |

Appeal from the Judgment of Sentence April 25, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CCR-0014438-2011

BEFORE: GANTMAN, P.J., SHOGAN, and LAZARUS, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED AUGUST 26, 2015**

Appellant, Larry Carter, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County on April 25, 2014, following a bench trial. We affirm.

The trial court summarized the facts of this case as follows:

> On June 23, 2011, at approximately 11:00 p.m., Albert Young-El ("Young-El") was visiting a family member at 615 Perth Place in the City and County of Philadelphia. Young-El disembarked from his bicycle and began to ask people whether they knew his cousin "Miz." It was a pleasant night and many people from the neighborhood were outside. Someone in the area pointed Young-El towards Appellant, who he knew from the neighborhood as "El Train." Appellant was sitting on a stoop with a young woman wearing yellow. Young-El introduced himself, and Appellant told him to "get out of here."
>
> Nydira Price ("Price"), who lived at 743 Green Street in the Spring Garden Apartments, was at home that night with her mother and her eight-year-old daughter. She saw Appellant, who she knew from the neighborhood by the nickname "El

Train," speaking with Young-El. Appellant was with several other men from the neighborhood. Appellant yelled, "I want my fuckin' money back." Price had previously seen Appellant selling drugs in the neighborhood.

As Young-El turned around, Appellant went to a small depression in a grassy area and removed a blue steel automatic gun. He then shot Young-El in the lower left side of his back, between his hip bone and his back. Young-El fell off the bike. Young-El, laying on the ground, could not see what was happening around him but heard many doors closing. Someone yelled, "Somebody call the cops, somebody call the cops." That was the last Young-El remembered before losing consciousness.

Appellant then walked away across the blacktop. Price observed the scene and saw that people were going about their business as though nothing had happened. Children were still playing and neighbors walked over Young-El's prone body; at least two people kicked him. When she realized that no one had called the police, Price backed into her doorway and tried to think of what to do. Price was terrified that if she called 911, the police would come to her home, potentially putting her family in danger. Then, however, she remembered that she had previously met Officer Joseph Ferrero[1] and had his cellphone number.[9]

> [9] Price had previously met Officer Ferrerro May 18th, 2011, when she had gone to the police station to make a report. She had identified a number of neighbors on a computer screen and Officer Ferrerro asked her to call him if she observed any crimes in the neighborhood.

Philadelphia Police Officer John Crichton and his partner Officer Lutz, after receiving information of the shooting over the radio, responded to the scene at approximately 11:13 p.m. As he pulled up to the projects and entered the courtyard, Officer Crichton observed a bike lying on the ground with Young-El collapsed atop it, shot in the left side . . . . Approximately

---

[1] The trial court spelled Officer Ferrero's surname is a variety of ways. The correct spelling is Ferrero. N.T., 1/15/14, at 52.

fifteen (15) to twenty (20) people were in the courtyard at the time. Young-El mumbled that he had been shot. Price remained at her door, watching as the police arrived. She heard Young-El mumble, "El Train did it; that fuckin El Train did it." However, Officer Lutz also asked Young-El who had shot him and he responded, "I don't know."

Officer Crichton decided that it was in Young-El's best interest not to wait for a medic, and so he and his partner transported Young-El in the police car to Hahnemann Hospital. As they picked up Young-El, other officers began to arrive on the scene.

It was approximately 11:15 p.m. when Price called Officer Ferrerro. He was in bed with his girlfriend when the phone rang, but he answered anyway. Price was very excited as she informed Officer Ferrerro that she had just seen "El Train," who Ferrerro knew as Larry Carter, shoot someone. She stated that the two men were involved in an argument, that Young-El was on a bicycle, and that "El Train" had shot him. Officer Ferrerro asked her if she had called 911 and informed Price he would have to call her back. Officer Ferrerro called Officer David Blackburn, who was working that night, and spoke with him regarding the information he had received.

Officer Ferrerro then called Price back and stated that he had notified the police officers who were on location, and Price responded, "Well, he's still standing out there." Officer Ferrerro then called Officer Blackburn, but Officer Blackburn did not see Appellant. Officer Ferrerro then informed Officer Blackburn that Appellant was still in the area. Although Officer Ferrerro called Price back and asked her if she would speak with a detective, . . . she was reluctant to do so. Price did not have further contact with the police that night due to her fear of retaliation; cooperating with the police is not safe.[10] Following his conversation with Officer Blackburn, Officer Ferrerro went back to bed.

[10] At trial, Price testified that she was afraid because of an incident where neighborhood girls had called the police regarding a drug dealer in the neighborhood, and he had shot up their house. Officer Ferrerro also discovered that Price had witnessed a few neighbors from the Penn Town

- 3 -

Homes beat up due to "snitching," and heard of someone's house being shot up.

Officer Blackburn responded in plain clothes and an unmarked car to the area of the shooting with his partner, Officer Butler. Upon arrival they were informed that the victim had already been transported, and thus they left the immediate area to patrol the neighborhood until receiving flash information. They then received information over the radio that "El Train" may have been involved in the shooting, as well as the phone call from Officer Ferrerro. Officer Blackburn knew "El Train" was Appellant's nickname. Officer Blackburn then searched the area for Appellant, and found his car, a 2000 GMC Yukon, black in color, parked west of 6th Street on Green Street. The officers then parked their car to set up surveillance.

Appellant then came through a cutout in a fence that lead into Marshall Place, stopped and looked around, then walked across the street and into the car. Appellant drove eastbound on Green Street, made a left hand turn the wrong way up 6th Street to Fairmount, and made several turns until finally stopping at 4th Street and Callowhill Street. The officers followed him, calling to marked cars for assistance in making the stop. Upon stopping Appellant, they asked for license, registration, and insurance. Although Appellant provided the officers with registration and insurance, he stated he did not have a license, at which time Officer Blackburn initiated a live stop and placed Appellant under arrest. Appellant was then taken directly to Central Detective Special Investigations Unit ("SIU").

Philadelphia Police Detective Edward Keppol was on duty at the Central Detectives SIU that evening. He and his partner, Detective Polumbo, responded to the crime scene at 615 Perth Place. There were no witnesses to be interviewed, however, they recovered one nine (9) millimeter Luger fired cartridge casing. They then went to Hahnemann Hospital to interview Young-El; however, they could not, as Young-El was in emergency surgery. Detectives Keppol and Polumbo then returned to Central Detectives to speak with Appellant and question him regarding the shooting. Appellant refused to give a formal statement and insisted he knew nothing about the shooting. Thus, after getting no information from him, Appellant was released.

After Young-El emerged from his coma at the hospital, he could only remember gradually what had happened. At first, he insisted he did not want to press charges. However, after talking to his young daughter, he decided to speak with the police. Detective Keppol interviewed him on July 19, 2011, at 9:05 a.m. Although paralyzed from the waist down, Young-El was coherent enough to review a photo array. Young-El stated that "El Train" had shot him, that he had known "El Train" for years, and that he was a black male about thirty (30) years old, six (6) feet and one (1) inches tall. Young-El identified Appellant from a photo array quite quickly. He circled and signed his identification.

On July 21, 2011, Detective Keppol executed a search warrant on Appellant's home at 1508 S. Dorrance Street in the City and County of Philadelphia. No weapons were found on the property.

On December 4, 2011, Police Officer Joseph Poretta responded to 2648 S. 61st Street after receiving information that Appellant's girlfriend lived there and he might have been staying with her. There was a warrant issued for Appellant's arrest in response to the shooting of Young-El. At approximately 1:30 p.m., Officer Poretta received a call that there was a male with a gun at that residence, and so he and his partner, Officer O'Brien, responded to the location. Officer Poretta went to the front door and Officer O'Brien to the back; they found Appellant standing in the living room with his girlfriend. Officer Poretta patted him down and asked for his information. Appellant told officers his name was John Green. However, having possessed Appellant's description, Officer Poretta attempted to put Appellant in handcuffs as he resisted. Officer O'Brien then provided photo ID of Appellant and they placed him under arrest.

Appellant attempted to pull away from them, stiffened up, stopped walking to the car. The officers had to push him into the back seat. As they struggled with him, Appellant blurted out, "It's okay. I have a lawyer; I will beat this case like I beat every other case."

At some time in August, 2012, Officer Ferrerro spoke with ADA Stacey Hughes regarding Price's statement. He explained to ADA Hughes that it would take much convincing to get Price to make a statement because she had begged Officer Ferrerro

not to let anyone know that she had spoken up, due to her fear something would happen to her family.

On August 8, 2012, Officer Ferrerro came to Price's home and stated that he was there because he had received a phone call, and informed Price she would have to give a statement. She then gave a statement about what she had seen and other information about Appellant. She had known him since October 2010 and knew him to drive a purple Cadillac, a gold car, and a black SUV, which he was driving the night of June 23, 2011. Two or three days after giving the statement, she was relocated by the District Attorney's Office.[11] Price's statement was also brought to Detective Keppol's attention at that time.

> [11] The District Attorney's Office also provided Price with $460 a month for daily necessities, $2,800 for rent, and $700 for subsistence.

Young-El has only "half a spine" and will not be able to walk again. He remained in Hahnemann Hospital from June 23, 2011 until October 25, 2011, and was readmitted twice subsequent to his discharge. He underwent a total of seven (7) surgeries.[12] Following his discharge, Young-El was sent to Magee rehab facility; however, he caught pneumonia there. From Magee, Young-El was discharged to a nursing home.

> [12] Three of those surgeries were performed during his time at Hahnemann.

Young-El cannot stand by himself. He cannot walk and a doctor informed him he would never be able to walk. Young-El's injuries necessitate a full time caretaker, twenty-four (24) hours a day, seven (7) days a week. Due to incontinence, he wears diapers and has a colostomy bag. Since the shooting, he has lost over fifty (50) pounds.

Trial Court Opinion, 10/22/14, at 3–9 (citations to the record omitted).

Appellant was arrested December 5, 2011, and charged with attempted murder, aggravated assault, multiple Violations of the Uniform Firearms Act ("VUFA"), possessing an instrument of crime ("PIC"), simple

assault, and recklessly endangering another person ("REAP"). Appellant waived a jury trial, and the court *nol prossed* the charges of simple assault and REAP. Appellant proceeded to a bench trial on November 26, 2013. The trial was bifurcated and concluded on January 30, 2014, whereupon the trial court found Appellant guilty on all remaining counts.

On April 25, 2014, the trial court sentenced Appellant to an aggregate term of thirty and one-half to sixty-one years of imprisonment. On April 29, 2014, Appellant filed a counseled Post-Trial Motion for Reconsideration of Sentence and/or for New Trial and/or In Arrest of Judgment. On August 28, 2014, Appellant's motion was denied by operation of law. Appellant filed a timely notice of appeal to this Court on September 4, 2014. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Whether Appellant's convictions for attempted murder, aggravated assault, possessing an instrument of crime, possession of a firearm by a prohibited person, carrying firearms on public street or public property in Philadelphia and carrying a firearm without a license were supported by sufficient evidence to establish all of the elements of each offense beyond a reasonable doubt where the testimony of the Complainant and the witness, Nydira Price, was so contradictory and so impeached upon cross-examination to the point where it was not worthy of belief and no reasonable inferences of guilt beyond a reasonable doubt could be drawn?

2. Whether the verdict was against the greater weight of the evidence, so as to shock one's sense of justice, where the testimony of the Complainant and the witness, Nydira Price, was so contradictory and so impeached upon cross-examination to the point where it was not worthy of belief

and no reasonable inferences could establish that Appellant committed the crimes of attempted murder, aggravated assault, possessing an instrument of crime, possession of a firearm by a prohibited person, carrying firearms on public street or public property in Philadelphia and carrying a firearm without a license?

3. Whether it was error for the trial court to admit testimony of witness Nydira Price's fear of retaliation where no evidence of any actual threats of retaliation and/or intimidation was offered by the Commonwealth?

4. Did the court abuse its discretion in sentencing Appellant to an excessive sentence?

5. Did the sentencing court err in denying Appellant's timely filed post-Trial Motion to reconsider?

Appellant's Brief at 5–6.[2]

Appellant's first issue relates to the sufficiency of the evidence. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Diamond*, 83 A.3d 119 (Pa. 2013). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the

---

[2] We have presented the issues in a different order than set forth in Appellant's brief.

crime by means of wholly circumstantial evidence. *Commonwealth v. Vogelsong*, 90 A.3d 717 (Pa. Super. 2014), *appeal denied*, 102 A.3d 985 (Pa. 2014). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, ___ A.3d ___, 2015 PA Super 148 (filed July 7, 2015).

Appellant first argues that the Commonwealth did not establish beyond a reasonable doubt that Appellant shot the victim or that he did so with the specific intent to kill him. Appellant acknowledges the victim's testimony that the victim was shot in the back after observing Appellant run into a grassy area and pull out a gun. Appellant's Brief at 22; N.T., 11/26/13, at 12–13. He contends however, that the victim did not actually state that he **saw** Appellant shoot him. Appellant's Brief at 22. Additionally, Appellant maintains that the victim told police he saw Appellant with two boys as the victim approached Appellant on the victim's bicycle, but in court, the victim stated that Appellant was sitting on the steps to a home with a girl dressed in yellow. *Id*. at 22–23. Appellant further alleges that the victim's testimony contradicted the testimony of witness Nydira Price ("Price"), who allegedly stated that she heard Appellant, while standing in a group of three men, say, "I want my fuckin' money." *Id*. at 23. Regarding the victim's injury, Appellant suggests that because the wound was to the lower back and not "the head, chest, or stomach," the shooting was not "done to bring

about a killing." *Id*. at 25. He posits that the "intended target area of the body could have been the legs or lower part of the body but because of the [victim's] movement and body position on the ground he was struck in the back near his spine." *Id*. For these reasons, Appellant maintains the evidence was insufficient to support the conviction for attempted murder.

Appellant's suggestion that the shooting in the lower back could not support the conviction for attempted murder, where the victim is paralyzed and now lacks "one-half" of his spine, is specious. Appellant cites no case law to support the premise that a shooting must be to the head, chest, or stomach only in order to prove attempted murder. Appellant was admitted to Hahnemann Hospital on June 23, 2011, underwent three operations in the ensuing months, and was discharged on October 25, 2011. N.T., 11/26/13, at 55. Defense counsel stipulated "to [the] entire stack of medical records." *Id*. at 54. That the bullet may have entered the victim's body through the back or side, and whether that was the "target area," is irrelevant. The firing of a bullet in the general area in which vital organs are located is sufficient to prove specific intent to kill beyond a reasonable doubt. *Commonwealth v. Manley*, 985 A.2d 256, 272 (Pa. Super. 2009) (citing *Commonwealth v. Padgett*, 348 A.2d 87, 88 (Pa. 1975)). Indeed, although the fatal slug "entered the victim through the buttock, the jury could properly infer the specific intent to kill from these circumstances." *Commonwealth v. Wyche*, 467 A.2d 636, 637 (Pa. Super. 1983).

The evidence established that Appellant shot the victim in the back near his spine. N.T., 11/26/13, at 15, 27. As a result of his injuries, the victim was in the hospital for four months, was readmitted on several occasions thereafter, and ultimately was transferred to a rehabilitation facility and nursing home. *Id*. at 22. He underwent seven surgeries, including the partial removal of his spine and will never walk again. *Id*. at 15.

The trial court stated as follows:

> Appellant first argues that the evidence was insufficient to sustain his conviction for attempted murder. Attempt is defined by statute as follows: "a person commits an attempt when with the intent to commit a specific crime, he does any act which constitutes a substantial step towards the commission of the crime." 18 Pa.C.S. § 901(a). A person may be convicted of attempted murder "if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act." *Commonwealth v. Dale*, 2003 PA Super 413, 836 A.2d 150, 152-53 (Pa. Super. Ct. 2003). The intent prerequisite to a finding of murder is malice, which is "a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, indicating unjustified disregard for the probability of death or great bodily harm." *Id*. A factfinder may properly infer malice from the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Seibert*, 424 Pa. Super. 242, 622 A.2d 361, 364 (1993) (citation omitted).

> The torso may be considered a vital part of the body. *Commonwealth v. Drumheller*, 570 Pa. 117, 142, 808 A.2d 893, 908 (2002).

> Here, the testimony introduced at trial established that Appellant fired a gun at Young-El's back, specifically in his torso near his spine, leaving him paralyzed from the waist down. N. T. 11/26/13 at 12-15; N. T. 1/15/14 at 11. Thus, the evidence was sufficient to show that Appellant used a deadly weapon on a vital

part of the victim's body, and Appellant is not entitled to relief upon this claim.

Trial Court Opinion, 10/22/14, at 10–11.

Price identified Appellant as "El Train" and as the shooter immediately after the shooting and at trial. N.T., 1/15/14, at 16, 73–74. Price testified that she watched Appellant shoot the victim from behind. *Id*. at 10. The victim identified Appellant as "El Train" and as the shooter, as well. *Id*. at 71; N.T., 11/26/13, at 25. The victim testified that as he walked away from Appellant, the victim continued to look at Appellant over his shoulder "the whole time." N.T., 11/26/13, at 29. In his statement to police one month after the shooting, the victim told police that El Train shot him. N.T., 1/15/14, at 39–41, 115. He identified Appellant from a photo array and accurately described Appellant's height, weight, and clothing he wore on the night of the shooting. *Id*. at 48–49; N.T. 1/15/14, at 82, 113–115. There was ample evidence in the record that Appellant was the shooter and that he had the specific intent to kill.

Appellant's sufficiency argument regarding his aggravated assault conviction is based on his contention that the evidence was insufficient to establish that Appellant 1) fired a gun at the victim's back and 2) caused or attempted to cause serious bodily injury. Appellant's Brief at 26. "A person is guilty of aggravated assault if he: (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human

life[.]" 18 Pa.C.S. § 2702(a)(1). "Bodily injury" is defined as "impairment of physical condition or substantial pain," while the Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.

Both the victim and Price testified that Appellant shot the victim in the back. N.T., 11/26/13, at 15, 27; N.T., 1/15/14, at 10, 16, 73–74. As a result of his injuries, the victim was in the hospital for four months, was readmitted on several occasions thereafter, underwent seven surgeries, including the partial removal of his spine, and will never walk again. N.T., 11/26/13 at 15, 22. Based on the foregoing, we conclude that the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of aggravated assault beyond a reasonable doubt. **Diamond**, 83 A.3d 119.

Appellant's issue concerning his VUFA convictions is waived for failure to assert any particularized argument. **See** Appellant's Brief at 28. Appellant reproduces the VUFA statutes and concludes that "the Commonwealth was unable to prove . . . the necessary elements." **Id**. As the requisite specificity is lacking, the claim is unreviewable. **Commonwealth v. Samuel**, 102 A.3d 1001, 1005 (Pa. Super. 2014) ("In

order to develop a claim challenging the sufficiency of the evidence properly, an appellant must specifically **discuss** the elements of the crime and identify those which he alleges the Commonwealth failed to prove.") (emphasis added). Moreover, Appellant's argument pertaining to this issue contains no citation to relevant legal authority beyond reference to our standard of review. Because Appellant's argument lacks analysis of relevant law and fails to apply law to the facts of the case, it is not properly developed. This failure to develop a legal argument precludes appellate review, and we conclude that this issue is waived. *Samuel*, 102 A.3d 1001.

Appellant next challenges the weight of the evidence supporting the verdict and contends that the verdict shocks the conscience because "Appellant's involvement . . . is based on mere conjecture." Appellant's Brief at 32. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Ferguson*, 107 A.3d 206, 213 (Pa. Super. 2015). "In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will be granted only where the facts and inferences of record disclose a palpable abuse of discretion." *Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008). Thus, "the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009).

Here, Appellant fails to cite to the record in support of his broad allegations and fails to cite any case law beyond the standard of review of such a claim. He suggests "it may be that [Price] thought that Appellant shot the victim simply because she saw him talking to the victim while standing in a group with two other males on the night of the shooting." Appellant's Brief at 32. To the contrary, Price was unwavering in her testimony that she watched as Appellant yelled, "I want my fuckin' money," raised his hand, fired one shot, and the victim fell. N.T., 1/15/14, at 10.

Appellant further contends that the victim's testimony that he knew of no reason why Appellant would "want to shoot him" suggests the verdict was against the weight of the evidence. That the victim could not identify a motive does not undermine the victim's testimony that Appellant shot him. Moreover, Appellant asserts that neither the victim nor Price saw a gun in the hands of Appellant. He fails to cite to the record in support of such a claim. The Rules of Appellate Procedure require that appellants adequately develop each issue raised with discussion of pertinent facts and pertinent authority. *See* Pa.R.A.P. 2119. "It is not this Court's responsibility to comb through the record seeking the factual underpinnings of an appellant's claim." *Samuel*, 102 A.3d at 1005 (citing *Commonwealth v. Mulholland*, 702 A.2d 1027, 1034 n.5 (Pa. 1997)).

In denying the weight-of-the-evidence claim, the trial court stated as follows:

> [T]his [c]ourt simply does not agree with the assessment of [the victim's] and Price's testimony as "contradictory" and impeached by cross-examination. After having the opportunity to listen to the testimony of each witness and observe their demeanors in court, the testimony of police officers, and all other relevant evidence, this [c]ourt found the testimony of [the victim] and Price credible, believable, and compelling.

Trial Court Opinion, 10/22/14, at 14. The trial court did not abuse its discretion in denying this weight-of-the-evidence claim.

Appellant next argues that it was error for the trial court to admit Price's admission of fear and retaliation "where no evidence of any actual threats" were offered by the Commonwealth. Appellant's Brief at 15, 28. While so labeling his argument, Appellant then asserts in his brief that the testimony "falls within the ambit of hearsay." *Id*. at 29.

The trial court held that this issue was waived. Trial Court Opinion, 10/22/14, at 14 ("Appellant now argues there was no evidence to support these statements [of fear], however, at trial his objections to Price's testimony were related to hearsay"). While acknowledging the finding of waiver, Appellant wholly fails to respond or assert the claim's preservation. In arguing its merits, Appellant mixes suggestions of hearsay evidence with allegations that Price's expressions of fear were mere speculation. Appellant's Brief at 29–30.

As pointed out by the Commonwealth, Appellant fails to identify the particular testimony he asserts is prejudicial and where it can be found in the record. Further, while Appellant contends Price's testimony was

- 16 -

"irrelevant" and "overly prejudicial," he made no such objection at trial. Commonwealth Brief at 19. Instead, he objected based on hearsay. N.T., 1/15/15, at 19. This constitutes waiver. *See Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. 2007) (holding that the appellant failed to preserve issue for appeal because objection he lodged in the trial court differed from basis raised on appeal). "The rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made." *Id*. at 1041.

Even if not waived, the issue lacks merit. Price testified that she telephoned Police Officer Ferrero, whose telephone number she had from an unrelated encounter, rather than call 911 "[b]ecause I was scared that the people from the neighborhood were going to come to my house." N.T. 1/15/14, at 15. This testimony was not hearsay nor was it specifically directed at Appellant. It was a mere explanation for "why [Price] had acted [in] a certain way." Trial Court Opinion, 10/22/14, at 15. "Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Tyson*, 2015 PA Super 138, *2, ___ A.3d ___, ___ (Pa. Super. 2015) (filed June 10, 2015). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of

- 17 -

bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Id***. We would find no abuse of discretion by the trial court.

Appellant's final two issues relate to the discretionary aspects of his sentence. Appellant claims the sentence imposed was excessive, the court failed to consider his background and character, and the motion to reconsider his sentence was improperly denied. Appellant's Brief at 18. It is well settled that there is no absolute right to appeal the discretionary aspects of a sentence. ***Commonwealth v. Hartle***, 894 A.2d 800, 805 (Pa. Super. 2006). Rather, an appellant's appeal should be considered to be a petition for allowance of appeal. ***Commonwealth v. W.H.M.***, 932 A.2d 155, 162 (Pa. Super. 2007).

As we observed in ***Commonwealth v. Corley***, 31 A.3d 293 (Pa. Super. 2011):

> We held in ***Commonwealth v. Malovich***, 903 A.2d 1247, 1250 (Pa. Super. 2006), that before we reach the merits of such a claim,
>
> > we must engage in a four part analysis to determine: (1) whether the appeal is timely; (2) whether Appellant preserved his issues; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is inappropriate under the sentencing code. ***Commonwealth v. Hyland***, 875 A.2d 1175, 1183 (Pa. Super. 2005). The third and fourth of these requirements arise because Appellant's attack on his sentence is not an appeal as of right. ***Id***. Rather, he must petition this Court, in his concise statement

> of reasons, to grant consideration of his appeal on the grounds that there is a substantial question. ***Id***. Finally, if the appeal satisfies each of these four requirements, we will then proceed to decide the substantive merits of the case. ***Id***.

***Id***. at 295–296.

The first requirement of the four-part test is met in that Appellant filed a timely appeal following the imposition of sentence. However, the record reflects that Appellant did not meet the second requirement because he failed to raise his current challenge in a post-sentence motion or at sentencing. While Appellant filed a counseled Post-Trial Motion for Reconsideration of Sentence and/or for New Trial and/or In Arrest of Judgment on April 29, 2014, his reference to his sentence averred only, "The defendant respectfully prays that the [c]ourt will reconsider his sentence." ***Id***. at unnumbered 2. There is no other particularized argument. Such a bald, conclusory claim is insufficient to preserve his sentencing issue. The fact that an issue is included in a Rule 1925(b) statement does not preclude its waiver under Pa.R.A.P. 302(a). ***See Commonwealth v. Melendez-Rodriguez***, 856 A.2d 1278, 1288–1289 (Pa. Super. 2004) (*en banc*). Therefore, the issue has been waived, and we need not consider it on its merits.

Even if not waived, the issue lacks merit. Appellant included in his appellate brief the necessary separate concise statement of the reasons relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119(f). Thus, we

would look to the statement to determine whether Appellant raised a substantial question requiring us to review the discretionary aspects of the sentence imposed by the trial court. A determination as to whether a substantial question exists is made on a case-by-case basis. *Commonwealth v. Griffin*, 65 A.3d 932, 935 *appeal denied*, 76 A.3d 538 (Pa. 2013). This Court will grant the appeal "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Sierra*, 752 A.2d 910, 912–913 (Pa. Super. 2000).

Appellant avers in his Pa.R.A.P. 2119(f) statement that the trial court abused its discretion by imposing an excessive sentence and failed to consider the background and character of Appellant. Appellant's Brief at 18. This Court has also held that "an excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question." *Commonwealth v. Caldwell*, 2015 PA Super 128, *4, ___ A.3d ___, ___, (Pa. Super. 2015) (filed May 29, 2015). Therefore, if the issue had not been waived, we would have found that Appellant asserted a substantial question in his brief.

The substance of the issue, however, lacks merit, and we would have affirmed the merits based upon the following statements by the trial court at sentencing:

> My sentence is based on numerous considerations. I had considered the presentence investigation report, the prior record score report. I've considered the appropriate portions of Commonwealth's memorandum for sentencing. I've considered the arguments of defense counsel, the arguments and witness of the Commonwealth. And also the victim impact statement that's been provided to the Court.
>
> There are three considerations in general in addition to other things that go into the sentencing at this point. First of all, it is the need to protect the community. And I think there is a substantial need in this case to protect the community, the gravity of the offense and the defendant's rehabilitative needs.
>
> In this case in considering the portions of the presentence investigation report there were mitigating factors there. Let me start with that. You did have a very sad upbringing; your lawyer is right. There was [sic] some tragic things in there, very sad existence that you had as a child. It's unfortunate. I suppose the trajectory of your life was set very early on. And it was difficult for you to get off of that track.
>
> It does look like maybe there were one or two times when you did try at least in some regard to get off track. But then you seemed to be right back on the path you had been on. Doesn't look like you had a whole lot of support, at least positive support. And I really couldn't discern any positive role models or people in your life that may have pointed you in the right direction. All of that is very sad. And I did think about that as I was reading through all that paperwork and thinking about your case. It's just too bad, it really is, for you to end up a statistic like this. That's really what you resorted to, that's what your life has led to, just being a statistic.
>
> We all get one chance at life and one would hope that you'd be able to have a meaningful impactful presence. Most of your life, at least to this point, you've chosen not to have a meaningful impactful presence, at least not in a positive way.

So in terms of needs to protect the community, that's one of my considerations. When you are in the community, you don't seem to make very good choices, decisions, productive decisions. Decisions you tend to make are destructive or a destructive path and counter-productive. So that's a consideration.

So in addition to that, when I think about the rehabilitative needs that you might have, you've been arrested so many times. It's shocking how many times you've been arrested. I don't know—I think I saw 17 times, I think, on the report. You've been arrested a lot of times.

Then in addition to that you've been incarcerated a number of times. You've been put on probation a number of times and violated a number of times. So that doesn't seem to work. You've been in for short stints and you get out and you do the same thing so that's not working.

So your rehabilitative needs are of a concern to the [c]ourt. Can't just do the same thing that's been happening because it's not doing anything, it's not changing your behavior. I'm explaining this because I want you to understand as best you can.

N.T. (Sentencing), 4/25/14, at 32–36.

In addition, we would rely on the statements the court made in its

Pa.R.A.P. 1925 (a) opinion, as follows:

At sentencing, Appellant presented testimony of his difficult childhood, including the fact that his mother gave up her parental rights when Appellant was nine, as well as testimony that Appellant was a good husband and father.

The Commonwealth presented evidence that he had been arrested at least eighteen (18) times, including nine (9) arrests in the district in which the instant shooting occurred, despite the fact that he does not live in that area. Additionally, Officer Blackburn testified to Appellant's reputation in the community as "someone you don't mess with." At the time of the shooting, Appellant was thirty-one (31) years of age.

     [The victim] submitted a victim impact statement by letter, stating that the shooting took a great toll on his life. He was in a coma for six (6) months and developed bed sores as a result, one of which is still open. He cannot bathe and will never be able to sit up in a chair again. He has half a spine, is paralyzed from the waist down, and is 85% bed bound. He is in constant, uncontrollable pain. He is incontinent and requires use of a colostomy bag. He cannot be there for his seven year old daughter. He is a burden on his thirty-six year old daughter who takes [care] of him. He is constantly depressed and suffers from suicidal thoughts.

     His testimony directly contradicted his statement at trial, that he does "not really mind" his injuries; this suggests that he was intimidated or afraid to testify regarding his true feelings in open court, facing Appellant.

     This Court had the benefit of the presentence report, the prior record score report, the appropriate portions of the Commonwealth's sentencing memorandum, the arguments of defense counsel (including that regarding Appellant's difficult childhood), the arguments and witness of the Commonwealth, as well as the victim impact statement. This Court weighed three considerations in addition to that information: the need to protect the community, the gravity of the offense, and Appellant's rehabilitative needs. Although taking into consideration Appellant's tragic childhood, this Court also balanced that against the severity of Appellant's crimes and his lengthy criminal history, showing an indication that Appellant may not be amenable to rehabilitation.

Trial Court Opinion, 10/22/14, at 16–17 (internal citations to the record omitted). Therefore, even if Appellant had properly preserved his sentencing claim, we would reject it as meritless.

Furthermore, because the trial court did not err in sentencing Appellant, his additional issue on appeal that the trial court abused its discretion in denying his post-sentence motion entitles him to no relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/26/2015