**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DAMIR WILLIAMS | : | |
| | : | |
| Appellant | : | No. 2882 EDA 2019 |

Appeal from the Judgment of Sentence  Entered May 24, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003682-2018

BEFORE:   SHOGAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 04, 2020**

Appellant, Damir Williams, appeals from the judgment of sentence entered May 24, 2019, following his conviction by a jury of one count each of second-degree murder, robbery, conspiracy to commit burglary, and criminal trespass.[1]  We affirm.

The trial court summarized the facts of this case as follows:

At trial, the Commonwealth presented the testimony of Philadelphia [P]olice [O]fficers John Durkin, Barry Sudler, Christopher Jones, and Matthew Lally, Philadelphia [P]olice [D]etectives Michael Cannon, Michael Corson, Daniel Plaza, and Thorsten Lucke, Burlington County [M]edical [E]xaminer Dr. Ian Hood, Fred Martella, Brittney Rehrig and Andrea Williams, and co-defendant Mark McLaughlin.[3]  [Appellant] presented the character testimony of Angel Santiago and Loretta Amons.  Viewed in the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  18 Pa.C.S. §§ 2502(b), 3701(a)(1)(i), 903, 3502(a)(1)(i), and 3503(a)(1), respectively.

light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

> 3 At Docket No. CP-51-CR-0003681-2018, Mark McLaughlin pled guilty to one count each of murder of the third degree (18 Pa.C.S. § 2502(c)), conspiracy to commit murder of the third degree (18 Pa.C.S. § 903), and burglary (18 Pa.C.S. § 3502), regarding the burglary and murder here at issue. At Docket No. CP-51-CR-0003683-2018, McLaughlin pled guilty to one count of burglary (18 Pa.C.S. § 3502), regarding the previous burglary of the Martella home discussed in the text, *infra*.

Mark McLaughlin lived at 7330 Hill Road, next-door to 7332 Hill Road, where the decedent, Anthony Martella, lived with his sister, Rosemary Martella.[4] On February 16, 2017, McLaughlin broke into the Martella home looking for money to support his drug habit. As a result of that break-in, he was arrested and charged with burglary on May 1, 2017. He was held in prison awaiting trial, but was released on September 13, 2017, at 3:00 a.m. The charges had been dismissed, since Rosemary and Anthony did not appear to testify.

> 4 Because Anthony and Rosemary Martella have the same last name, they will be referred to hereafter using their first names.

On the very day he was released from prison, McLaughlin decided that he would break into the Martella home again. He met up with [Appellant], Damir Williams, whom he had known for several years. McLaughlin told [Appellant] that he had previously burglarized the Martella home, and that they could do it again to get some money.

Around 5:00 a.m. that morning, [Appellant] and McLaughlin went to the back door of the Martella home. Anthony answered the door and invited McLaughlin and [Appellant] in the home. [Appellant] then choked Anthony and jumped on top of him. McLaughlin and [Appellant] found tape inside the home and [Appellant] tied Anthony up while McLaughlin held him down. McLaughlin then went upstairs to Rosemary's bedroom to grab money. On the second floor, McLaughlin found Rosemary in her room and asked her for money. McLaughlin found and took a

- 2 -

purse that contained $150, car keys, and some bank cards. McLaughlin and [Appellant] then left the home and used the car keys to take Rosemary's car. At some point McLaughlin cut the phone lines using scissors.

Around 7:45 a.m., Rosemary went to the home of a neighbor, off-duty police officer John Durkin. Rosemary told Officer Durkin that McLaughlin had gotten into her home again [and] had cut her phone line. Officer Durkin knew that McLaughlin had previously broken into the Martella home and that McLaughlin had been in prison for the break-in. Officer Durkin and Rosemary called her other brother, Fred Martella, and then started to call 911 when Rosemary told Officer Durkin that Anthony was tied up in the basement. Officer Durkin and Rosemary then went into the Martella home. When they arrived, Anthony was untied but kept rubbing his hands over his chest, was short of breath, and seemed increasingly uncomfortable. Officer Durkin also noticed a broken lamp in the middle bedroom, tape on the basement floor at the bottom of the stairs, and that Rosemary's car was missing from her driveway.

Between 8:00 and 8:30 a.m., an ambulance arrived and took Anthony to Roxborough Hospital. The same day, Detective Michael Cannon went to the hospital, but was unable to interview Anthony because Anthony was in too much pain. Detective Cannon received a phone call later that day that Anthony had been transferred to Temple Hospital because he was in more serious condition than previously thought.

On September 18, 2017, McLaughlin was interviewed by detectives at the Northwest Detective Division. During the interview, McLaughlin admitted to entering the Martella home with [Appellant] on September 13, 2017, and stated that he saw [Appellant] hit, choke, and tie up Anthony.

Rosemary's car was found on Welsh Road in close proximity to McLaughlin's grandmother's house. Rosemary's purse, taken from the second floor bedroom of her home, was found inside the car. The car was dusted for fingerprints, revealing a fingerprint from [Appellant] on the passenger side door handle.

Prior to the break-in on September 13, 2017, Rosemary and Anthony were in good health and able to live alone. Following the break-in, Anthony was transported to Roxborough hospital. He

never regained his ability to speak and could no longer stand or walk. At Roxborough Hospital, he was put on a ventilator. After about two weeks, doctors performed a tracheostomy. Anthony was unconscious and not able to swallow or eat, so a feeding tube was inserted. Once he could breathe on his own he was transferred to a nursing home. Because he could not clear his airway by coughing or swallowing properly, he had episodes where he would aspirate secretions from his nose and mouth into his lungs, causing pneumonia.

Doctors determined that Anthony had suffered a hypoxic brain injury, that is, brain injury caused by a lack of oxygen getting to the brain. The injury was permanent, and Anthony had no chance to recover. After two or three episodes of aspiration pneumonia, his family made the decision to stop active treatment and for Anthony to go into hospice care. He remained in a nursing home until he died on March 15, 2018, at the age of 76.

An autopsy was done on Anthony by Dr. Ian Hood, a medical examiner for Burlington County and an expert in the field of forensic pathology. Dr. Hood determined that Anthony's immediate cause of death was pneumonia, but that the pneumonia was caused by the hypoxic brain injury that Anthony had previously sustained during the burglary. Dr. Hood explained that the brain injury was Anthony's primary cause of death as it was the cause of the pneumonia from which Anthony ultimately died.

Trial Court Opinion, 12/31/19, at 2–5 (internal citations to the record omitted).

Following a five-day jury trial, Appellant was convicted of the above-described charges. On May 24, 2019, the trial court sentenced Appellant to life imprisonment for second-degree murder, with a consecutive term of imprisonment of ten to twenty years for conspiracy to commit burglary, and no further penalty for criminal trespass. The conviction for robbery merged with second-degree murder for the purposes of sentencing.

Appellant filed a timely post-sentence motion, which was denied on September 13, 2019. Appellant filed a notice of appeal.[2] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issues, which are identical to the issues raised in Appellant's Rule 1925(b) statement:

    I.   Whether the [c]ourt erred when it denied the Appellant's request to provide the deliberating jury with a written explanation of the defense of character and reputation evidence where the relevant Rule provides that a jury can be furnished with a written explanation of the charges and the defenses?

    II.   Whether the Appellant's conviction for Murder in the Second Degree was based upon insufficient evidence where the uncontested evidence at trial was that the intervening cause of the decedent's death was the family's decision to withhold life saving treatment to cure the decedent's pneumonia where such treatment had been successful two times in the past?

    III.   Whether the Appellant's convictions were against the weight and credibility of the evidence and shocking to one's sense of justice where the only witness who placed the Appellant inside of the home was the corrupt and polluted co-defendant, where the medical records refuted the contention that the victim had been strangled and where the uncontested evidence was that there was an intervening decision by family members of the decedent to withhold necessary medical treatment to the victim to cure his pneumonia that interrupted the chain of events that led to the decedent's death?

---

[2] Appellant filed his notice of appeal to this Court from the denial of post-sentence motions on September 13, 2019. Notice of Appeal, 10/7/19. In a criminal action, the appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions. ***Commonwealth v. Kuykendall***, 2 A.3d 559, 560 n.1 (Pa. Super. 2010). We have amended the caption accordingly.

Appellant's Brief at 6–7 (re-ordered for ease of disposition).

Appellant first asserts the trial court "lacked a defensible reason" for denying Appellant's request to provide the jury with a written explanation of character and reputation evidence. Appellant's Brief at 30–31. This issue is premised upon Pa.R.Crim.P. 646, "Material Permitted in Possession of the Jury," which provides, in pertinent part as follows:

> (A) Upon retiring, the jury may take with it such exhibits as the trial judge deems proper, except as provided in paragraph (C).
>
> (B) The trial judge may permit the members of the jury to have for use during deliberations written copies of the portion of the judge's charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed.

Pa.R.Crim.P. 646 (A) and (B).

Appellant next argues that the Commonwealth failed to present sufficient evidence to support the conviction for second-degree murder. Appellant's Brief at 38–39. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Green*, 203 A.3d 250, 253 (Pa. Super. 2019), *appeal denied*, 216 A.3d 1036, 54 WAL 2019 (Pa. July 30, 2019). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence."

*Commonwealth v. Colon-Plaza*, 136 A.3d 521, 525–526 (Pa. Super. 2016) (quoting *Commonwealth v. Robertson-Dewar*, 829 A.2d 1207, 1211 (Pa. Super. 2003)). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. *Commonwealth v. Mucci*, 143 A.3d 399, 409 (Pa. Super. 2016). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Rogal*, 120 A.3d 994 (Pa. Super. 2015).

Finally, Appellant contends the verdict was against the weight of the evidence, a claim Appellant raised in his post-sentence motion. Appellant's Brief at 31–37, Post Sentence Motion, 5/31/19, at ¶ 3. The standard in reviewing a weight-of-the-evidence claim is well settled:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis and citations omitted).

We have considered the arguments of the parties, the relevant law, and the complete record. The trial court aptly addressed all of Appellant's issues at length and authored a cogent, thorough opinion. For this reason, we affirm the judgment of sentence on the basis of the trial court's December 31, 2019 Pa.R.A.P. 1925(a) opinion. In the event of future proceedings, the parties are directed to attach a copy of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/4/20

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION 2019 DEC 31 PM 12: 22

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0003682-2018 |
| | : | |
| v. | : | |
| | : | |
| DAMIR WILLIAMS | : | |

## OPINION

BRONSON, J.                                                    December 31, 2019


On May 24, 2019, following a jury trial before this Court, defendant Damir Williams was

convicted of one count each of murder of the second degree (18 Pa.C.S. § 2502(b)), robbery (18

Pa.C.S. § 3701(a)(1)(i)), conspiracy to commit burglary (18 Pa.C.S. §§ 903, 3502(a)(1)(i)), and

criminal trespass (18 Pa.C.S. § 3503(a)(1)). The Court immediately imposed the mandatory

sentence of life in prison for the murder charge (18 Pa.C.S. § 1102(a)(1)), with a consecutive

term of 10 to 20 years incarceration for conspiracy and no further penalty for criminal trespass,

for an aggregate sentence of life plus 10 to 20 years in prison.[1] Defendant timely filed post-

sentence motions, which the Court denied on September 13, 2019.

Defendant has now appealed from the judgment of sentence entered by the Court on the

grounds that: 1) "the Court erred when it denied the defendant's request to provide the

deliberating jury with a written explanation of the affirmative defense of character and reputation

evidence where the relevant Rule provides that a jury can be furnished with a written explanation

of the charges and of the defenses"; 2) the evidence was legally insufficient to sustain the verdict

of second-degree murder; and 3) the verdict was against the weight of the evidence.[2]

---

[1] Due to merger with second-degree murder, no judgment was entered on the robbery conviction.
[2] Defendant's claims have been reordered for ease of analysis.

1

Defendant's 1925(b) Statement at ¶¶ 1-3. For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia police officers John Durkin, Barry Sudler, Christopher Jones, and Matthew Lally, Philadelphia police detectives Michael Cannon, Michael Corson, Daniel Plaza, and Thorsten Lucke, Burlington County medical examiner Dr. Ian Hood, Fred Martella, Brittney Rehrig and Andrea Williams, and co-defendant Mark McLaughlin.[3] Defendant presented the character testimony of Angel Santiago and Loretta Amons. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

Mark McLaughlin lived at 7330 Hill Road, next-door to 7332 Hill Road, where the decedent, Anthony Martella, lived with his sister, Rosemary Martella.[4] N.T. 5/22/2019 at 41, 85; N.T. 5/21/2019 at 84. On February 16, 2017, McLaughlin broke into the Martella home looking for money to support his drug habit. N.T. 5/22/2019 at 22, 54, 83. As a result of that break-in, he was arrested and charged with burglary on May 1, 2017. N.T. 5/22/2019 at 61. He was held in prison awaiting trial, but was released on September 13, 2017, at 3:00 a.m. The charges had been dismissed, since Rosemary and Anthony did not appear to testify. N.T. 5/22/2019 at 62.

On the very day he was released from prison, McLaughlin decided that he would break into the Martella home again. N.T. 5/22/2019 at 41. He met up with defendant, Damir

---

[3] At Docket No. CP-51-CR-0003681-2018, Mark McLaughlin pled guilty to one count each of murder of the third degree (18 Pa.C.S. § 2502(c)), conspiracy to commit murder of the third degree (18 Pa.C.S. § 903), and burglary (18 Pa.C.S. § 3502), regarding the burglary and murder here at issue. At Docket No. CP-51-CR-0003683-2018, McLaughlin pled guilty to one count of burglary (18 Pa.C.S. § 3502), regarding the previous burglary of the Martella home discussed in the text, *infra*.

[4] Because Anthony and Rosemary Martella have the same last name, they will be referred to hereafter using their first names.

2

Williams, whom he had known for several years. McLaughlin told defendant that he had previously burglarized the Martella home, and that they could do it again to get some money. N.T. 5/22/2019 at 41, 43, 54-55.

Around 5:00 a.m. that morning, defendant and McLaughlin went to the back door of the Martella home. N.T. 5/21/2019 at 84, 209; N.T. 5/22/2019 at 23, 41. Anthony answered the door and invited McLaughlin and defendant in the home. N.T. 5/22/2019 at 41. Defendant then choked Anthony and jumped on top of him. N.T. 5/22/2019 at 46. McLaughlin and defendant found tape inside the home and defendant tied Anthony up while McLaughlin held him down. N.T. 5/22/2019 at 47-48. McLaughlin then went upstairs to Rosemary's bedroom to grab money. N.T. 5/22/2019 at 41, 50. On the second floor, McLaughlin found Rosemary in her room and asked her for money. N.T. 5/22/2019 at 50. McLaughlin found and took a purse that contained $150, car keys, and some bank cards. N.T. 5/22/2019 at 41, 43. McLaughlin and defendant then left the home and used the car keys to take Rosemary's car. N.T. 5/22/2019 at 43, 148-49, 233-34. At some point McLaughlin cut the phone lines using scissors. N.T. 5/22/2019 at 48, 57-58.

Around 7:45 a.m., Rosemary went to the home of a neighbor, off-duty police officer John Durkin. N.T. 5/21/2019 at 192-94. Rosemary told Officer Durkin that McLaughlin had gotten into her home again had cut her phone line. N.T. 5/21/2019 at 194-95, 212. Officer Durkin knew that McLaughlin had previously broken into the Martella home and that McLaughlin had been in prison for the break-in. N.T. 5/21/2019 at 208, 212-213. Officer Durkin and Rosemary called her other brother, Fred Martella, and then started to call 911 when Rosemary told Officer Durkin that Anthony was tied up in the basement. N.T. 5/21/2019 at 195-96. Officer Durkin and Rosemary then went into the Martella home. N.T. 5/21/2019 at 196. When they arrived, Anthony was untied but kept rubbing his hands over his chest, was short of breath, and seemed increasingly

3

uncomfortable. N.T. 5/21/2019 at 199, 205, 209. Officer Durkin also noticed a broken lamp in the middle bedroom, tape on the basement floor at the bottom of the stairs, and that Rosemary's car was missing from her driveway. N.T. 5/21/2019 at 200, 202-203, 207-208.

Between 8:00 and 8:30 a.m., an ambulance arrived and took Anthony to Roxborough Hospital. N.T. 5/21/2019 at 86, 209. The same day, Detective Michael Cannon went to the hospital, but was unable to interview Anthony because Anthony was in too much pain. N.T. 5/22/2019 at 134, 136. Detective Cannon received a phone call later that day that Anthony had been transferred to Temple Hospital because he was in more serious condition than previously thought. N.T. 5/22/2019 at 136-37.

On September 18, 2017, McLaughlin was interviewed by detectives at the Northwest Detective Division. N.T. 5/22/2019 at 34. During the interview, McLaughlin admitted to entering the Martella home with defendant on September 13, 2017, and stated that he saw defendant hit, choke, and tie up Anthony. N.T. 5/22/2019 at 41, 47.

Rosemary's car was found on Welsh Road in close proximity to McLaughlin's grandmother's house. N.T. 5/22/2019 at 43, 45. Rosemary's purse, taken from the second floor bedroom of her home, was found inside the car. N.T. 5/22/2019 at 41, 43-44. The car was dusted for fingerprints, revealing a fingerprint from defendant on the passenger side door handle. N.T. 5/23/2019 at 26-27.

Prior to the break-in on September 13, 2017, Rosemary and Anthony were in good health and able to live alone. N.T. 5/21/2019 at 85. Following the break-in, Anthony was transported to Roxborough hospital. N.T. 5/21/2019 at 86. He never regained his ability to speak and could no longer stand or walk. N.T. 5/21/2019 at 86-87, 89. At Roxborough Hospital, he was put on a ventilator. N.T. 5/21/2019 at 108. After about two weeks, doctors performed a tracheostomy.

4

N.T. 5/21/2019 at 108. Anthony was unconscious and not able to swallow or eat, so a feeding tube was inserted. Once he could breathe on his own he was transferred to a nursing home. N.T. 5/21/2019 at 108. Because he could not clear his airway by coughing or swallowing properly, he had episodes where he would aspirate secretions from his nose and mouth into his lungs, causing pneumonia. N.T. 5/21/2019 at 109.

Doctors determined that Anthony had suffered a hypoxic brain injury, that is, brain injury caused by a lack of oxygen getting to the brain. The injury was permanent, and Anthony had no chance to recover. N.T. 5/21/2019 at 109-110. After two or three episodes of aspiration pneumonia, his family made the decision to stop active treatment and for Anthony to go into hospice care. N.T. 5/21/2019 at 109, 122. He remained in a nursing home until he died on March 15, 2018, at the age of 76. N.T. 5/21/2019 at 86, 107.

An autopsy was done on Anthony by Dr. Ian Hood, a medical examiner for Burlington County and an expert in the field of forensic pathology. N.T. 5/21/2019 at 96, 104-105. Dr. Hood determined that Anthony's immediate cause of death was pneumonia, but that the pneumonia was caused by the hypoxic brain injury that Anthony had previously sustained during the burglary. N.T. 5/21/2019 at 119-20. Dr. Hood explained that the brain injury was Anthony's primary cause of death as it was the cause of the pneumonia from which Anthony ultimately died. N.T. 5/21/2019 at 119-20.

## II. DISCUSSION

*A. Court's Refusal to Send Out Written Jury Instructions Regarding Character Evidence*

Defendant's first claim is that "[t]he Court erred when it denied the defendant's request to provide the deliberating jury with a written explanation of the affirmative defense of character and reputation evidence where the relevant Rule provides that a jury can be furnished with a

5

written explanation of the charges and of the defenses." Defendant's 1925(b) Statement ¶ at 1. This claim is without merit.

During deliberations, the jury is not permitted to have, *inter alia*, the written jury instructions, except "[t]he trial judge may-permit the members of the jury to have for use during deliberations written copies of the portion of the judge's charge on the elements of the offenses, lesser included offenses, and any defense upon which the jury has been instructed." Pa.R.Crim.P. 646(B) & (C). The Comment to Rule 646 makes it clear that "once the judge permits the use of the written elements, the elements of all the offenses, lesser included offenses, and defenses upon which the jury was instructed must be provided to the jury in writing." Pa.R.Crim.P. 646 Cmt. Here, defendant claims that because the Court elected to send written copies of the elements of the charged offenses to the jury, it was error for the Court to deny defense counsel's request to send out a written copy of the instruction on character evidence.

The Court properly rejected defense counsel's request, since "character evidence" is not a "defense" within the meaning of Rule 646, but rather a form of evidence that the jury may consider in evaluating the prosecution's case. The standard jury instruction itself makes this clear:

> The defense offered evidence tending to prove that the defendant is a person of good character....The law recognizes that a person of good character is not likely to commit a crime that is contrary to that person's nature. Evidence of good character may by itself raise a reasonable doubt of guilt and require a verdict of not guilty. You must weigh and consider the evidence of good character along with the other evidence in the case. If, on all of the evidence, you have a reasonable doubt of the defendant's guilt, you must find him not guilty. However, if, on all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty, then you should find him guilty.

6

Pennsylvania Suggested Standard Criminal Jury Instructions (Pa.SSCJI) § 3.06 (3d. 2016 rev. April 2005). The instruction is premised upon the Pennsylvania Rules of Evidence, which allow a defendant in a criminal case to offer evidence of a pertinent character trait to prove that the defendant acted in accordance with that character. Pa.R.E. 404(a)(1) & (2). As the instruction states, a finding of good character on some relevant trait does not provide defendant with a stand-alone defense, but rather, gives rise to admissible evidence for the jury to consider that must be weighed and considered with all of the other evidence in the case. *See Commonwealth v. Sandusky*, 77 A.3d 663, 673-74 (Pa. Super. 2013) (while evidence of good character is admissible, it must be weighed and considered with the other evidence in the case). As the instruction says, while character evidence may, by itself, raise a reasonable doubt, that is only true after it is weighed against the Commonwealth's evidence. *Id.*

A defendant may offer overwhelming and undisputed character evidence on a pertinent trait that bears directly on the charges at issue, but which does not, after being weighed against the other evidence in the case, give rise to a reasonable doubt of guilt. Accordingly, proof of character is not a defense such as, for example, justification or self-defense (18 Pa.C.S. §§ 503, 505), which require a verdict of not guilty if not disproven by the prosecution. Rather, the character evidence instruction is akin to the jury instructions on accomplice testimony (Pa.SSCJI § 4.01), or prior inconsistent statements (Pa.SSCJI § 4.08A), which do not describe the elements of a defense, but rather only explain to the jury the permissible uses of evidence. For that reason, Rule 646 required the Court *not* to send the character evidence instruction out with the jury. Pa.R.Crim.P. 646 (B) & (C) (barring the court from sending out in writing any jury instructions apart from those setting forth elements of the offenses or elements of any defenses).[5]

---

[5] Understandably, defense counsel was unable to provide the Court with any authority to support his argument that the character instruction should be provided to the jury under Rule 646. N.T. 5/23/2019 at 72-74.

7

Therefore, the trial Court acted in accordance with Rule 646 in not providing jurors with written instructions on character evidence. No relief is due.

*B. Sufficiency of the Evidence*

Defendant's next claim is that "defendant's conviction for Murder in the Second Degree was based upon the insufficient evidence where the uncontested evidence at trial was that the intervening cause of the decedent's death was the family's decision to withhold life saving treatment to cure the decedent's pneumonia where such treatment had been successful two times in the past." Defendant's 1925(b) Statement at ¶ 3. This claim is without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the fact-finder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (quoting *Commonwealth v. Brumbaugh*, 932 A.2d 108, 109 (Pa. Super. 2007)). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "[A] mere conflict in the testimony of the witnesses does not render the evidence insufficient..." *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa. Super. 1998). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Ramtahal*, 33 A.3d at 607. "If the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001)).

8

"'A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.'" *Commonwealth v. Knox*, 50 A.3d 732, 739 (Pa. Super. 2012), *appeal denied*, 69 A.3d 601 (Pa. 2013) (citing 18 Pa.C.S. § 2502(b)). "The 'perpetration of a felony' is defined as: 'The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.'" *Id.* A defendant must act with malice when he commits second-degree murder; however, the factfinder may infer malice from the underlying felony. *See Commonwealth v. Haynes*, 577 A.2d 564, 575 (Pa. Super. 1990), *appeal denied*, 589 A.2d 689 (Pa. Super. 1991).

As instructed by the Court, to have found the defendant guilty of second degree murder, the jury must have determined that the defendant's conduct was the direct cause of the decedent's death beyond a reasonable doubt. N.T. 5/23/2019 at 207-10. Here, defendant claims that he did not cause Anthony's death because the family made a decision to end treatment and that decision was an intervening cause of Anthony's death. Defendant's 1925(b) Statement ¶ at 3.

In order to be a direct cause of a death, the defendant's conduct must have been a direct and substantial factor in bringing about the death. *Commonwealth v. Paolello*, 665 A.2d 439, 453 (Pa. 1995). This does not require that the defendant's conduct be the last or the immediate cause of death, but that the conduct initiated an unbroken chain of events leading to the death of the victim. *Commonwealth v. Hicks*, 353 A.2d 803, 805 (Pa. 1976). In order to establish this chain of causation, "the defendant's conduct must be an antecedent, but for which the result in question would not have occurred," and "the results of the defendant's actions cannot be so extraordinarily

9

remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Commonwealth v. Nunn*, 947 A.2d 756, 760 (Pa. Super. 2008), *appeal denied*, 960 A.2d 838 (Pa. 2008).

There may be multiple direct causes of a death. A defendant may escape criminal liability only "if the occurrence of another event plays such an independent, important, and overriding role in bringing about the death compared with the role of the defendant that the defendant's conduct does not amount to a direct and substantial factor in bringing about the death." *Paolello*, 665 A.2d at 453.

Here, the medical examiner who conducted the autopsy on Anthony, Dr. Ian Hood, testified to a reasonable degree of scientific certainty that the head injury and choking of Anthony during the burglary initiated an unbroken chain of events that led to Anthony's death. According to Dr. Hood, the beating and choking of Anthony caused a deprivation of oxygen to Anthony's brain that resulted in severe and irreversible brain injury. N.T. 5/21/2019 at 112-117. As a result of his injuries, Anthony was unconscious for six months following the attack on September 13, 2017. N.T. 5/21/2019 at 106. He was unable to breathe on his own, so he was put on a ventilator. N.T. 5/21/2019 at 108. He was too weak to eat or swallow, so a feeding tube was put into his abdominal wall. N.T. 5/21/2019 at 108. Because he was unable to control his airway, he had episodes where secretions from his nose or mouth would be aspirated into his lungs causing pneumonia. N.T. 5/21/2019 at 109. After multiple episodes of aspiration pneumonia, his family made a decision to stop active treatment in favor of pain management in hospice care. N.T. 5/21/2019 at 120-22.

When questioned about the medical decision to end treatment, Dr. Hood stated that the family "knew he had pneumonia terminally, but they weren't going to go through the same

10

repetitive process of returning him to the hospital, having him fixed, and come back." N.T. 5/21/2019 at 121. Anthony had already contracted pneumonia two or three times since entering a nursing home, and his inability to clear his airway on his own meant that he would likely contract pneumonia again. N.T. 5/21/2019 at 120-23. Dr. Hood went on to say that the decision to put Anthony in hospice care was "appropriately elected" by the family. N.T. 5/21/2019 at 121. Although pneumonia was the immediate cause of death, Anthony's hypoxic brain injury caused the repeated episodes of pneumonia and led Dr. Hood to conclude that the cause of death was "pneumonia due to head injury." N.T. 5/21/2019 at 117, 120, 122-23, 155.

Accordingly, the evidence established that Anthony died from complications of his brain injury, which was a direct result of defendant's conduct committed during the burglary of Anthony's home. Accordingly, there was sufficient evidence to find defendant guilty of murder in the second degree.

## C. *Weight of the Evidence*

Defendant also claims that his conviction is against the weight of the evidence (1) "where the only witness who placed the defendant inside of the home was the corrupt and polluted co-defendant," (2) "where the medical records refuted the contention that the victim had been strangled," and (3) "where the uncontested evidence was that there was an intervening decision by family members of the decedent to withhold necessary medical treatment to the victim to cure his pneumonia that interrupted the chain of events that led to the decedent's death." Defendant's 1925(b) Statement at ¶ 2.

It is well-established that a new trial may only be granted by the trial court where the verdict was so contrary to the weight of the evidence as to "'shock one's sense of justice.'" *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004), *app. denied*, 878 A.2d 864

11

(Pa. 2005) (quoting *Commonwealth v. Hunter*, 554 A.2d 550, 555) (Pa. Super. 1989)).

Moreover, credibility determinations are solely within the province of the fact-finder, and "[a]n appellate court cannot substitute its judgment for that of the finder of fact." *Commonwealth v. Taylor*, 63 A.3d 327, 330 (Pa. Super. 2013) (internal quotation omitted). In considering a claim that the trial court erred in refusing to find that a verdict was against the weight of the evidence, "appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Id.* (quoting *Shaffer*, 40 A.3d at 1253).

Here, defendant's first weight claim is premised upon his contention that the Commonwealth's witness, co-defendant Mark McLaughlin, was not credible. Specifically, defendant argues that the testimony of McLaughlin, the only witness who placed defendant inside of the home, was not credible because McLaughlin was "corrupt" and "polluted." *See* Defendant's 1925(b) Statement at ¶ 2. This claim is without merit.

It is true that when an accomplice testifies against a defendant, the accomplice has a strong motive to lie in order to obtain favorable treatment. As a result, the court is required to instruct the jury that the accomplice is a "corrupt and polluted source," whose testimony must be viewed with great caution. *See, e.g., Commonwealth v. Johnson*, 192 A.3d 1149, 1153-54 (Pa. Super. 2018), *app. den.* 400 A.3d 440 (Pa. 2019). However, as the standard "corrupt and polluted source" instruction states, "an accomplice may be a perfectly truthful witness," and such testimony "is more dependable if supported by independent evidence." Pa.SSCJI § 4.01 (3d ed. 2016 rev. May 2016); *see Johnson*, 192 A.3d at 1153 (rejecting weight claim where accomplice testimony was corroborated).

Here, the Commonwealth presented compelling independent evidence to corroborate the statement of McLaughlin that incriminated defendant. McLaughlin told detectives that he and

12

defendant entered the Martella home at approximately 5:00 a.m. and left in Rosemary's Kia. N.T. 5/21/2019 at 209; N.T. 5/22/2019 at 233-34. McLaughlin said he then drove defendant to "B and Indiana," and dropped the defendant off there. N.T. 5/22/2019 at 42. McLaughlin told detectives that he then left Rosemary's car on Welsh Road near his grandmother's house. N.T. 5/22/2019 at 44-45. The Commonwealth presented surveillance video recovered from a home across the street from the Martella home, which showed two men leaving the Martella home at approximately 5:30 a.m. and entering Rosemary's car. N.T. 5/22/2019 at 259-60, 262, 264-65, 268-69. That car was later found near McLaughlin's grandmother's house. N.T. 5/22/2019 at 45. The car was dusted for fingerprints and a print from defendant was found on the inside of the passenger side door. N.T. 5/23/2019 at 26-27. The jury was entitled to believe that the video surveillance, combined with the fingerprint evidence, strongly corroborated McLaughlin's contention that he burglarized the Martella home with defendant.

It is also true that McLaughlin was the only eyewitness able to testify about the assault and other events inside of the Martella home. However, even if the jury believed that McLaughlin minimized his own involvement regarding the attack on Anthony, and exaggerated defendant's involvement, that would have had no effect on the jury's verdict. Because the jury only convicted defendant of second degree murder and conspiracy to commit burglary, the details regarding the events in the house were not important. So long as defendant and McLaughlin agreed to burglarize the home, then followed through on that agreement, and then Anthony died as a direct result of the burglary, the jury's verdict was fully supported by the evidence. *See, e.g., Commonwealth v. Lambert*, 795 A.2d 1010, 1021-1024 (Pa. Super. 2002), *app. den.*, 805 A.2d 521 (Pa. 2002) (second degree murder requires that defendant participated in

13

a burglary, either as a conspirator or accomplice, and that the victim was killed by someone in furtherance of the burglary).

Defendant's second weight claim alleges that the medical records refute the contention that the victim had been strangled. Defendant's 1925(b) Statement at ¶ 2. This claim is without merit.

First, the medical examiner, Dr. Hood, did not testify that the cause of death was strangulation. Rather, he stated that death was caused by head injuries, which led to a lack of oxygen to Anthony's brain. N.T. 5/21/2019 at 117. The lack of oxygen permanently damaged the brain, ultimately causing pneumonia and death. N.T. 5/21/2019 at 110, 117. While Dr. Hood testified that Anthony may also have been strangled, the relevant finding was that during the burglary, Anthony sustained injuries that damaged his brain and led to his death. Whether he killed by a blow to the head, strangulation, or both, would not have affected the weight of the evidence on the issue of causation.

Finally, defendant argues that his conviction is against the weight of the evidence because the decision of the decedent's family members to end active treatment was an intervening cause of the decedent's death. Defendant's 1925(b) Statement at ¶ 2. For the reasons set forth above in Section (II)(B), above, this claim is without merit.

The evidence presented during the trial plainly established that defendant committed the crimes of which he was convicted. Because the evidence fully supported the verdict, the Court did not abuse its discretion in denying defendant's motion for a new trial.

14

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

GLENN B. BRONSON, J.

15